STATE OF NORTH CAROLINA v. DARRELL CHRISTOPHER WOODS

No. 228A95

(Filed 10 February 1997)

**1. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's argument—absence of acknowledgement of wrongdoing—not a comment on failure to testify**

There was no error in a capital sentencing hearing where defendant contended that the prosecutor improperly commented on his decision not to testify where defendant gave at least two different accounts of his involvement to law enforcement officials within two days of the murder. In context, the prosecutor's comment was not directed to defendant's failure to testify, but was an effort to convince the jury that there was no evidence of an acknowledgement of wrongdoing within two days of the murder. The prosecutor's argument here was not reasonably comparable to arguments which have been held to be improper comments on a defendant's failure to testify.

**Am Jur 2d, Trial §§ 577-582.**

**Supreme Court's views as to what comments by prosecuting attorney violate accused's privilege against self-incrimination under Federal Constitution's Fifth Amendment. 99 L. Ed. 2d 926.**

**2. Criminal Law § 467 (NCI4th Rev.)— capital sentencing— forcible entry into victim's apartment—prosecutor's argument—permissible inference**

There was no error in closing arguments in a capital sentencing hearing where defendant contended that there was no evidence to support the State's argument that defendant had forced entry into the victim's apartment, but there was sufficient evidence from which a juror could find that defendant either forced

his way into the victim's apartment or used some pretext or threat of harm to gain entry. The prosecutor's argument was a reasonable inference to be drawn from the evidence.

**Am Jur 2d, Trial § 632.**

3. **Criminal Law § 460 (NCI4th Rev.)— capital sentencing—prosecutor's argument—memory of victim's infant daughter**

There was no error in a capital sentencing proceeding where the prosecutor argued that the victim's 14-month-old daughter, who witnessed her mother's murder, would find out about the murder from the public record or a flashback. In view of the holding in *State v. Reeves*, 337 N.C. 700, and the evidence suggesting that the infant was painfully aware of what was happening to her mother, the prosecutor did not engage in improper argument.

**Am Jur 2d, Trial § 632.**

4. **Criminal Law § 453 (NCI4th Rev.)— capital sentencing—prosecutor's argument—victim's family**

The prosecutor's closing argument in a capital sentencing proceeding was not so grossly improper as to require intervention *ex mero motu* where defendant contended that the argument improperly suggested that the jury would be accountable to the victim's family. The argument was a plea for the jury to give serious consideration to the victim's death and the unique loss to her family; these types of arguments have been held not improper.

**Am Jur 2d, Trial §§ 664-667.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

5. **Evidence and Witnesses § 2954 (NCI4th)— capital sentencing—cross-examination of defense mental health expert about fees**

There was no abuse of discretion in a capital sentencing proceeding where the prosecutor cross-examined the defense mental health expert about his fees. Defendant did not make a showing that the cross-examination had an improper influence on the jury.

**Am Jur 2d, Trial § 695; Witnesses § 888.**

Cross-examination of expert witness as to fees, compensation, and the like. 33 ALR2d 1170.

**6. Criminal Law § 447 (NCI4th Rev.)— capital sentencing—prosecutor's argument—defense mental health diagnosis**

There was no error in a capital sentencing proceeding where defendant contended that the prosecutor's argument as to the defense mental health expert's testimony distorted the evidence regarding the diagnosis of schizoid personality disorder and led the jury to infer that the witness did not know much about his business. The prosecutor was attempting to show that the characteristics of schizoid personality disorder are not that unusual and are likely to be exhibited by any number of people; his argument was supported by the evidence and was entirely appropriate to support the State's position that the jury should not find the mental or emotional disturbance mitigating circumstance.

**Am Jur 2d, Trial §§ 609, 611.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**7. Criminal Law § 471 (NCI4th Rev.)— capital sentencing—prosecutor's argument—defense mental health tests—underscoring of weaknesses**

The prosecutor's argument in a capital sentencing proceeding was proper and supported by the evidence where defendant contended that the prosecutor had suggested that "the house and tree and person test" was the sole basis of the defense mental health expert's opinion, but a review of the evidence demonstrates that the prosecutor referred to other tests during cross-examination. The prosecutor is free to underscore during closing argument those points of defendant's case which he or she perceives as weak.

**Am Jur 2d, Trial § 611.**

**8. Criminal Law § 447 (NCI4th Rev.)— capital sentencing—prosecutor's argument—nonstatutory mitigating circumstance—drug dependence**

There was no gross impropriety requiring intervention *ex mero motu* in a capital sentencing hearing where the prosecutor

STATE v. WOODS

[345 N.C. 294 (1997)]

legitimately made the point that while defendant denied using cocaine and defense witnesses who knew defendant all denied any knowledge of drug use by defendant, the defense mental health expert found him to be a cocaine addict. The State was entitled to point out the absence of evidence to support the non-statutory mitigating circumstance of drug dependence and to challenge the credibility of the expert's opinion.

**Am Jur 2d, Evidence § 1443; Witnesses § 1032.**

9. **Criminal Law § 444 (NCI4th Rev.)— capital sentencing— prosecutor's argument—defendant as "thing"—no error**

There was no error in a capital sentencing proceeding where the prosecutor in his argument referred to defendant as a "thing." While the prosecutor's choice of language is not condoned, the argument can reasonably be characterized as urging the jury to recognize the especially cruel nature of this murder.

**Am Jur 2d, Trial § 681.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

10. **Evidence and Witnesses § 2797 (NCI4th)— capital sentencing—cross-examination—defense mental health expert—defendant not called liar**

The trial court did not err in a capital sentencing proceeding where defendant contended that the prosecutor improperly called him a liar during cross-examination of the defense mental health expert. The prosecutor did not call defendant a liar, but rather asked a meaningful question about the significance of test results that were the basis for an expert opinion.

**Am Jur 2d, Trial §§ 499, 500; Witnesses §§ 743, 746, 750.**

11. **Criminal Law § 446 (NCI4th Rev.)— capital sentencing— defense witnesses—prosecutor's argument**

There was no error in a capital sentencing hearing where defendant contended that the prosecutor in his closing argument expressed his opinion that defendant's mother, his sisters, and another witness (who all testified to defendant's stepfather's absence during most of defendant's childhood and adolescence) were liars. The prosecutor was arguing to the jury that it should

not find the submitted circumstance that defendant grew up without a father figure during his formative years. Defendant's mother testified that defendant never knew his natural father and that she married his stepfather when defendant was an infant and it was thus reasonable to infer that defendant's biological father might still be alive. Moreover, the trial court sustained the objection to the extent that the prosecutor's comment was not supported by the evidence.

**Am Jur 2d, Trial §§ 692, 693.**

**Propriety and prejudicial effect of counsel's negative characterization or description of witness during summation of criminal trial—modern cases. 88 ALR4th 209.**

12. **Criminal Law § 467 (NCI4th Rev.)— capital sentencing— prosecutor's argument—victim's final words—inference from evidence**

A portion of the prosecutor's closing argument in a capital sentencing proceeding was not so inflammatory and unsupported by the evidence as to require intervention *ex mero motu* where the prosecutor cast the victim's final words as having been spoken to her daughter. Although the prosecutor's argument touched upon facts not specifically testified to, it was reasonable to infer from the evidence that the victim's last words would have been to express her love for her child. Assuming error, it was not so grossly improper as to require intervention *ex mero motu*.

**Am Jur 2d, Trial §§ 632, 649, 664-667.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

13. **Criminal Law § 456 (NCI4th Rev.)— capital sentencing— prosecutor's argument—general fear of crime**

The prosecutor in a capital sentencing proceeding did not make an improper argument based on the general public's fear of violent crime and on the jurors' own fears of violent crimes where the prosecutor held up a picture of the exterior of the victim's apartment building and argued that, of all the pictures, that one was the most grotesque because "she was where we all think we can go and be safe," continued to argue the sanctity of the home, and ended with "and that's why this is grotesque, cause it

STATE v. WOODS

[345 N.C. 294 (1997)]

tells each and every one of you you are safe nowhere now. You're safe nowhere." The prosecutor's argument was within the wide latitude afforded counsel in hotly contested cases, was amply supported by the evidence, and the trial court did not err by failing to intervene *ex mero motu*.

**Am Jur 2d, Trial § 654.**

**14. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— prosecutor's argument—State held to a higher burden**

There was no prejudicial error in a capital sentencing proceeding where defendant contended that the prosecutor improperly argued that the State was disadvantaged by the law governing capital sentencing. The prosecutor's argument emphasized that the jury must hold the State to a higher burden than it holds defendant and the jury found two statutory mitigating circumstances as well as two nonstatutory mitigating circumstances. The argument concerning stacked rules was not so grossly improper as to require intervention *ex mero motu*.

**Am Jur 2d, Trial §§ 625, 632-639.**

**15. Criminal Law § 461 (NCI4th Rev.)— capital sentencing— prosecutor's argument—what life sentence would be like— deterrent value of death**

There was no error in a capital sentencing proceeding where the prosecutor made several arguments, to which defendant did not except, referring to what a life sentence would be like and stating that it would not be adequate to deter other murders. Defendant's general deterrence argument has previously been rejected, and the argument about the conditions of life in prison emphasized the State's position that defendant deserved death rather than a comfortable life in prison.

**Am Jur 2d, Trial §§ 609 et seq.**

**Propriety and prejudicial effect of prosecutor's argument to jury indicating that he has additional evidence of defendant's guilt which he did not deem necessary to present. 90 ALR3d 646.**

**16. Criminal Law § 480 (NCI4th Rev.)— capital sentencing— prosecutor's argument—cumulative effect—not prejudicial**

The cumulative effect of the arguments of the prosecutor in a capital sentencing hearing did not create prejudicial error where

the comments did not so infect the trial with unfairness as to make the result a denial of due process and did not stray so far from the bounds of propriety as to impede the defendant's right to a fair trial.

**Am Jur 2d, Trial § 1613.**

**17. Jury § 229 (NCI4th)— capital murder—jury selection— ambivalent answers about death penalty**

The trial court properly excused a prospective juror for cause from a capital first-degree murder prosecution where defendant contended that the juror was fit to serve because he stated at one point that he would apply the law as it was given to him, but, after receiving ambivalent responses, the trial court questioned the juror and excused him for cause.

**Am Jur 2d, Trial §§ 1693 et seq.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**18. Criminal Law § 1348 (NCI4th Rev.)— capital sentencing— life without parole—not submitted—crime committed prior to 1 October 1996**

The trial court did not err in a capital sentencing hearing by denying defendant's motion to allow the jury to consider life without parole as a sentencing option. The legislature intended for N.C.G.S. § 15A-2002 to become effective 1 October 1994 and to be applied prospectively; this crime occurred on 1 April 1994.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**Propriety of imposition of death sentence by state court following jury's recommendation of life imprisonment or lesser sentence. 8 ALR4th 1028.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**19. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A death sentence was proportionate where the record supported the jury's findings of aggravating circumstances, the sen-

tence was not entered under the influence of passion, prejudice, or other arbitrary consideration, and the sentence is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Defendant inflicted wounds on the victim consistent with torture before leaving her to bleed to death, the victim was murdered a few feet from where her infant daughter sat, and the victim was bound, gagged, cut, stabbed, and burned and would have suffered tremendously before dying. We can imagine the helplessness and terror the victim must have felt as she endured the torture, knowing that she was going to die, leaving her fourteen month old child in the hands of her killer.

**Am Jur 2d, Criminal Law §§ 609 et seq.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by DeRamus, J., on 22 May 1995 in Superior Court, Forsyth County. Heard in the Supreme Court on 14 November 1996.

*Michael F. Easley, Attorney General, by Gail E. Weis, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

MITCHELL, Chief Justice.

Defendant Darrel Christopher Woods was indicted on 17 January 1995 for the first-degree murder of Trae Devon Gibson. Prior to selection of the jury, defendant entered a plea of guilty to first-degree murder. After a separate capital sentencing proceeding, the jury recommended a sentence of death, and the trial court sentenced defendant accordingly.

The State's evidence tended to show *inter alia* that on 2 April 1994, Steven Carter, boyfriend of the victim and father of their child, left their apartment on Brownsboro Road at about 7:45 a.m. to go to work. Carter testified that he met defendant outside the apartment in the parking lot. Defendant asked Carter if he could borrow a screwdriver to remove a radio from a car, and Carter brought defendant one from the apartment. In about five minutes, defendant returned the screwdriver, explaining that it was the wrong type. Carter then drove to work.

Casey Greene, a friend of defendant's, testified that at around 8:00 a.m. on 2 April 1994, he saw defendant borrow a screwdriver to get the radio out of a white car outside the apartments on Brownsboro Road. Mr. Greene left the area at around 9:00 a.m., and when he returned, at around noon, he saw defendant again in front of the apartments. They spoke for about five minutes, and Greene left to go to his girlfriend's house across the street. He did not see defendant again.

Shawn Ratliff, a neighbor of Carter and Gibson's, who had gone to high school with defendant, testified that he was leaving his apartment at around 9:00 a.m. and saw defendant. Ratliff told defendant he was going to run an errand and would be right back. When Ratliff returned at about 10:00 a.m., he saw defendant with Greene, standing in front of the stairwell near Carter and Gibson's apartment. Trae Gibson was standing in her doorway talking to a man in a black car whom Ratliff did not know. Defendant told Ratliff that he was going to try to make some money and showed Ratliff two pieces of crack cocaine. Ratliff asked defendant if he needed money, and defendant told him no. Ratliff left and did not see defendant again.

Randy Lee Webster, Gibson's cousin, testified that he saw her between 9:30 and 10:00 a.m. in her burgundy Toyota MR-2, with her baby Yo Yo, on her way to the laundromat. At about 11:00 a.m., he saw her again at home. She stood in the doorway of her apartment talking to Webster, who was in his black Talon automobile. While Webster was there, defendant approached the car and said he was trying to raise money for a hotel room. Webster saw no conversation take place between defendant and Gibson. Webster told Gibson he would see her later and left. He never saw Gibson again.

At 3:00 p.m., Carter arrived at home and noticed that Gibson's Toyota was not in the parking lot. He spoke with a neighbor for about thirty minutes before walking into the apartment. The apartment was unlocked, which was unusual. When Carter entered, he saw that it had been ransacked. Carter went to the bedroom and found Gibson's naked body lying on the floor. She was bound and gagged and had been cut and stabbed. Carter ran out of the apartment screaming for his neighbor, Shawn Ratliff, to call 911. Tammy May, who was dating Carter's brother and who had spent a lot of time with Carter, Gibson, and their daughter Yo Yo, was present and saw Steve Carter come running out of his apartment. May's immediate concern was the baby, and she ran into the apartment, where she saw Gibson's body. The

baby was lying on the bed, a few feet away from her mother's body. She was not moving. May lifted Yo Yo's head and saw that her eyes were swollen and red as though she had cried herself to sleep. May had kept Yo Yo on the weekends before and had never seen her eyes look like that. As Carter was too hysterical to take care of the baby, May held her until Gibson's parents arrived.

Officer Chris Bullard of the Winston-Salem Police Department was the first officer to arrive at the crime scene. He testified that there was no sign of forced entry into the apartment. Dr. Donald Jason, who performed the autopsy on Gibson's body, testified that there were twenty stab wounds to the neck; eight incise wounds to the neck; five stab wounds to the midchest; and burns on the lower back, right buttock, and left upper thigh. The burns were consistent with having been inflicted by a curling iron. The incise wounds appeared to have been made in order to cut the skin off the neck, consistent with torture. Trae Gibson bled to death; the stabbings would have caused her great pain and suffering. Dr. Jason testified that death would have occurred in fifteen to thirty minutes.

Officer Mark Triplett of the Hickory Police Department got a call regarding a car matching the description of Gibson's car. Triplett and two other officers chased and stopped the car and found a man named J.D. Williams in the car by himself. Williams told Officer Triplett the whereabouts of the person who gave him the car. He did not know the person's name, but identified defendant from a photographic array. When defendant was arrested at 5:00 a.m. on 3 April 1994, he was wearing orange pants stained with blood that was later found to match the victim's blood.

By his first assignment of error, defendant contends that the prosecutor engaged in overly zealous conduct in closing argument and during the presentation of evidence and that this deprived defendant of a fair capital sentencing proceeding. Defendant cites eight instances in which he contends the prosecutor engaged in overzealous conduct that prejudiced him in this case. We address each instance in turn.

[1] First, defendant argues that the prosecutor improperly commented on defendant's decision not to testify during trial. Regarding the submitted nonstatutory mitigating circumstance that defendant had acknowledged wrongdoing within two days of the commission of the murder, the prosecutor argued as follows:

STATE v. WOODS

[345 N.C. 294 (1997)]

Of course, after this terrible accident where he nicked her one time with the knife, he freaked out and he drove to Hickory. That's his acknowledgment of wrong doing. Have you heard one word in this trial about any remorse this man has shown at any time? None. Have you ever said you're sorry?

Defendant contends that this comment violated his Fifth Amendment right against compelled self-incrimination as well as his rights under Article I, Section 23 of the North Carolina Constitution. We disagree.

Any reference by the State regarding a defendant's failure to testify violates an accused's constitutional right to remain silent. *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106 (1965). However, in this case, the prosecutor made no such reference. After reviewing the context in which the prosecutor's comment was made, we conclude that the comment was not directed to defendant's failure to testify, but was an effort to convince the jury that there was no evidence of an acknowledgement of wrongdoing by defendant within two days of the murder which would support the submitted mitigating circumstance.

Defendant gave at least two different accounts of his involvement in the incident to law enforcement officials within two days of the murder. In his first statement, given on 3 April 1994, the day after the murder, defendant stated that he found Gibson's door open, went inside, and found her body bound and gagged. In his statement given on 4 April 1994, defendant stated that he had sex with Gibson; he picked up a knife, and when she came towards him, the knife "must have just went [sic] in her." It was not until 26 January 1995, nearly ten months after the murder, that defendant confessed to stabbing Gibson. We conclude that the prosecutor's comment is not reasonably comparable to those arguments which we have held to be improper comments on a defendant's failure to testify. *See, e.g., State v. McCall*, 286 N.C. 472, 212 S.E.2d 132 (1975); *State v. Monk*, 286 N.C. 509, 212 S.E.2d 125 (1975). This argument is without merit.

[2] Next, defendant contends that the State argued facts unsupported by the evidence. The first argument about which defendant complains occurred at the beginning of the State's first argument:

[PROSECUTOR]: Thank you, if the Court please. This is the way he found her. (holds picture up) A beautiful, twenty-four year old vibrant mother. I submit to you this is the way she appeared to this Defendant when he forced his way into her apartment—

At this point, defense counsel objected, and the trial court overruled the objection. Defendant contends that there was no evidence to support the State's argument that defendant forced his way into Gibson's apartment. Defendant further argues that Officer Chris Bullard testified that he saw no sign of forced entry into the apartment. Defendant contends that the trial court erred in overruling defendant's objection to this argument. We disagree.

A review of the evidence supports a reasonable inference that defendant forced his way into Gibson's apartment. Steven Carter, the victim's boyfriend who lived with the victim and their daughter, testified that there were no knives in the apartment except for butter knives. This tends to establish that defendant entered the apartment armed with a sharp knife. Moreover, even if defendant did not forcibly break down the door to enter, he could still have been guilty of forcing his way into the apartment. Further, "a breaking may be actual or constructive." *State v. Young*, 312 N.C. 669, 681, 325 S.E.2d 181, 189 (1985). As we stated in *Young*, a constructive breaking occurs when entrance to the dwelling is accomplished through fraud, deception, or threatened violence. *Id.* Based on Carter's testimony, a reasonable juror could have inferred that the victim did not know defendant, that defendant had never been in her apartment before, and that defendant brought the knife into the apartment with him. Further, evidence tended to show that defendant had been hanging around the apartment and telling people he was in need of money. We conclude that there was sufficient evidence from which a reasonable juror could find that defendant either forced his way into the victim's apartment or used some pretext or threat of harm to gain entry. The prosecutor's argument that defendant forced his way into the apartment was a reasonable inference to be drawn from the evidence. The trial court did not err in overruling defendant's objection to this argument.

[3] Defendant further contends that the prosecutor engaged in improper argument regarding the victim's infant daughter, who witnessed her mother's murder. The prosecutor argued that "Yo Yo" Gibson would find out about the murder either from the public record or from a flashback. The prosecutor made the following argument:

Or, the other way she's going to find out, is she's going to be driving along the highway and it's going to hit her like that, she will have a flashback to that day, and she'll remember every—

**STATE v. WOODS**

[345 N.C. 294 (1997)]

[Defense Counsel]: Objection.

[Prosecutor]:—every single stab wound—

THE COURT: Overruled.

[Prosecutor]: However she remembers it, she will find out about it. And when she does, she's going to have the right to come up to each and every one of you and ask you one simple question, do you think that justice was done in this case? What will you tell her?

Defendant first contends that there was no evidence to support the prosecutor's contention that the victim's child would remember what happened in a flashback. While we will not speculate about what the victim's daughter might remember regarding her mother's murder, a review of the State's evidence indicates that there was evidence to show that the victim's daughter witnessed her mother's killing. The State's evidence tended to show that when the toddler was found, a few feet away from her mother, her eyes were swollen and red, as though she had cried herself to sleep. Tammy May, a witness who had kept Yo Yo on weekends, testified that she had never seen the child's eyes look like that. Moreover, defendant told Detective Rowe that at some point while he was "rubbing the knife blade all over [the victim's] body," the baby somehow got defendant's attention. Detective Rowe testified that defendant told him he "reached for the baby but then pulled away from the baby and decided he needed to get out of there." We conclude that, based on this evidence, a juror reasonably could have inferred that the victim's daughter not only witnessed her mother's murder before her eyes, but was traumatized by that event. As to whether the child would later remember the murder, this Court addressed a similar argument in *State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802 (1994), *cert. denied*, ⎯ U.S. ⎯, 131 L. Ed. 2d 860 (1995). In *Reeves*, the defendant entered the home of a woman he did not know and ordered her to send her two-and-a-half-year-old daughter from the room. The defendant then brutally cut and sexually assaulted the victim. Speaking of the victim's child, who had witnessed the brutality, the prosecutor said, "she'll probably begin to remember more of [the events]. [S]ome people think a child's mind is like a piece of film. It records it and it develops it later." *Id.* at 732, 448 S.E.2d at 817. We stated in *Reeves* that "the prosecutor was arguing what he considered to be general knowledge, which he could do." *Id.* In view of our holding in *Reeves* and the evidence in the present case suggesting that the infant was painfully aware of what was hap-

pening to her mother, we conclude that the prosecution did not engage in improper argument with regard to what the victim's child might remember.

**[4]** Defendant further argues that the second portion of the prosecutor's argument improperly suggested that the jury would be accountable to the victim's family. As defendant did not object to this argument at trial, our review is limited to determining whether the argument was so grossly improper that the trial court erred by failing to intervene *ex mero motu*. We conclude that it did not. The prosecutor's argument was a plea for the jury to give serious consideration to the victim's death and the unique loss to her family. We have previously held that these types of arguments are not improper. *See, e.g.,* *State v. Brown*, 320 N.C. 179, 202-03, 358 S.E.2d 1, 13 (prosecutor's argument that jury should find defendant guilty in order to grant justice to the victim's family not reversible error), *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987); *State v. Oliver*, 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1983) (prosecutor's argument regarding victim's rights and reality of victim's death not improper). This argument is without merit.

The next instance of prosecutorial conduct about which defendant complains is the cross-examination of Dr. Charles Guyer, the defense mental health expert, and three prosecutorial arguments regarding Dr. Guyer's opinions about defendant's mental health. After carefully reviewing the transcript regarding this evidence, we conclude that neither the cross-examination of Dr. Guyer nor the arguments made by the prosecution were improper.

**[5]** Defendant first argues that the prosecutor improperly questioned Dr. Guyer regarding his fees. Defendant made no objection to the cross-examination and therefore must show plain error. Defendant has not done so. As we stated in *State v. Carver*, 286 N.C. 179, 209 S.E.2d 785 (1974), the scope of cross-examination rests largely within the trial court's discretion and is not ground for reversal unless the cross-examination is shown to have improperly influenced the verdict. We conclude that defendant has not made a showing that the cross-examination in the present case had an improper influence on the jury. This argument is without merit.

**[6]** The first argument about which defendant complains referred to the mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance. The prosecutor made the following argument:

**STATE v. WOODS**

[345 N.C. 294 (1997)]

[PROSECUTOR]: And here's what schizoid is, according to Dr. Guyer, you lack close friends, you're indifferent to praise or criticism, and you're emotionally cold, and that's a schizoid.

You know, I could go out there on the street and throw a rock and probably hit about three or four schizoid people this morning.

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained to the extent not supported by the evidence.

[PROSECUTOR]: And Dr. Guyer, what a fine professional, here's Dr. Guyer's research into [defendant], the house and tree and person test.

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]: He don't talk to his mother, his friends, he don't pick up the phone and call Dorothea Dix-

THE COURT: Overruled.

[PROSECUTOR]:—he makes him draw a house, a person, a tree, and a family, and another person. He lacks close friends, that's what he found. He lacks close friends from this drawing.

And you heard his parade of friends come in here. He never lacked for close friends. And Dr. Guyer says these tests are the same over time, if you test them when he's three years old, he lacks close friends, and same at twenty-six.

Defendant first contends that this argument distorted the evidence regarding Dr. Guyer's diagnosis of schizoid personality disorder and led the jury to infer that Dr. Guyer "did not know much about his business." Defendant's contention is misplaced. The prosecutor was attempting to show that the characteristics of schizoid personality disorder are not that unusual and are likely to be exhibited by any number of people. We conclude that the prosecutor's argument was supported by the evidence and was entirely appropriate to support the State's position that the jury should not find the mental or emotional disturbance mitigating circumstance.

**[7]** Defendant also contends that the prosecutor improperly suggested that "the house and tree and person test" was the sole basis for Dr. Guyer's opinion. Yet a review of the evidence demonstrates that

during cross-examination of Dr. Guyer the prosecutor also referred to the MMPI, the Incomplete Sentence Blank, and the Millon Clinical Multiaxial Inventory as tests given to defendant during his stay at Dorothea Dix Hospital. The prosecutor is free to underscore during closing argument those points of defendant's case that he perceives as weak. The prosecutor's argument was entirely proper and supported by the evidence.

[8] The third argument about which defendant complains is the prosecutor's argument against findings of mitigation based on cocaine abuse. Regarding whether defendant was a cocaine addict, the prosecutor argued:

> He was not a cocaine addict, or you would have heard it from somebody. You would have heard it from somebody.
>
> He even denied it to Dr. Guyer, who asked him. He denied it to Detective Rowe who asked him, do you use drugs, alcohol? No, I don't. He didn't use cocaine folks, until he got down there to Dorothea Dix and started planning his defense.
>
> And Dr. Guyer's explanation for that is well the first sign of being cocaine dependent is that you deny it. That's kind of a catch twenty-two, isn't it? You can go in there and you admit to Dr. Guyer you're a cocaine addict or you can deny it, either way he's going to write down you're a cocaine addict.
>
> I guess I'm a cocaine addict. I am one, because I deny I've ever done it.

As defendant failed to object to this argument at trial, we review it only to determine whether it was so grossly improper that the trial court erred by failing to intervene *ex mero motu* to correct it. We conclude that the trial court did not so err. After reviewing the context in which this argument was made, we conclude that the State's argument legitimately made the point that while defendant denied using cocaine and defense witnesses who knew defendant all denied any knowledge of drug use by defendant, Dr. Guyer found him to be a cocaine addict. The State was entitled to point out the absence of evidence to support the nonstatutory mitigating circumstance of drug dependence and to challenge the credibility of Dr. Guyer's opinion. This argument is without merit.

[9] Defendant next complains that the prosecutor improperly referred to defendant as a "thing" and that this encouraged the jury to

disregard his status as a human being in recommending its sentence. We disagree. It is not improper for counsel to make an argument urging the jurors to appreciate the circumstances of the crime. *State v. Artis*, 325 N.C. 278, 325, 384 S.E.2d 470, 497 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). In *Artis*, the victim died by manual strangulation. During sentencing in *Artis* the prosecutor asked the jurors to hold their breath for as long as they could during a four-minute stretch of time in an effort to help them understand the dynamics of manual strangulation. In that case, we concluded that the argument was neither an improper nor a prejudicial sentencing argument. *Id.*

As we stated in *Oliver*, 309 N.C. at 360, 307 S.E.2d at 326, the emphasis during sentencing "is on the circumstances of the crime and the character of the criminal." With that in mind, we note that the evidence tended to show that defendant bound, gagged, tortured, burned, and repeatedly stabbed the victim and left her to bleed to death in front of her infant daughter. While we do not condone the prosecutor's choice of language to describe defendant's character, the argument can reasonably be characterized as urging the jury to recognize the especially cruel nature of this murder. It is the duty of the prosecution in a capital sentencing proceeding to "strenuously pursue the goal of persuading the jury that the facts of the particular case at hand warrant imposition of the death penalty." *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994). This argument is without merit.

**[10]** Defendant also contends that the prosecutor improperly called defendant a liar during cross-examination of Dr. Guyer. After considering this argument in context, and in conjunction with the rest of the evidence, we find the prosecutor's cross-examination to have been proper.

Dr. Guyer testified that defendant had denied using cocaine and that defendant had stated that he was not addicted to cocaine. Further, Dr. Guyer testified that his opinion concerning defendant's cocaine use was based on Dix Hospital's evaluation of defendant, Dr. Guyer's own testing of defendant, and his interviews with defendant. The prosecutor then proceeded as follows:

Q. So you didn't believe [defendant], did you?

A. No, I did not believe that he did not use drugs.

Q. Okay. You found him to be manipulative, didn't you?

A. Yes, I did.

Q. And basically that means he's a liar?

[DEFENSE COUNSEL]: OBJECTION.

THE COURT: OVERRULED.

A. If everyone who is manipulative is a liar then all of us in here are. Manipulation is something everyone does everyday. I think he's more manipulative than most.

The prosecutor did not call defendant a liar, but rather asked a meaningful question about the significance of test results that were the basis for an expert opinion. The trial court did not err by overruling defendant's objection. This argument is without merit.

[11] Finally, defendant contends that the prosecutor expressed his opinion that defendant's mother, his sisters, and Dexter Felder were liars. These individuals all testified to defendant's stepfather's absence during most of defendant's childhood and adolescence. With regard to the submitted nonstatutory mitigating circumstance that defendant had no father figure during his formative years, the prosecutor argued as follows:

And you think about the irony in this case, he wants you to give him credit cause they didn't move with his dad to San Antonio. Give him credit for not having a father figure, when he's taken away—he's taken away a girl's mother. (holds up photograph) That's a fair trade. As far as I know his dad is still alive—

[DEFENSE COUNSEL]: OBJECTION, Your Honor.

THE COURT: SUSTAINED, to the extent not supported by the evidence.

We conclude that the prosecutor's argument cannot reasonably be construed to imply that defense witnesses had lied. The prosecutor was arguing to the jury that it should not find the submitted mitigating circumstance that defendant grew up without a father figure during his formative years. Defendant's mother testified that defendant never knew his natural father and that she married his stepfather when defendant was an infant. Thus, it is reasonable to infer that defendant's biological father might still be alive. Moreover, the trial court sustained the objection to the extent that the prosecutor's comment was not supported by the evidence. Where the trial court sus-

tains a defendant's objection, he has no grounds to except. *State v. Quick*, 329 N.C. 1, 29, 405 S.E.2d 179, 196 (1991).

[12] Defendant next contends that a portion of the prosecutor's closing argument was inflammatory and unsupported by the evidence. As defendant failed to object to this argument at trial, we are limited to determining whether the argument was so grossly improper that the trial court erred by failing to intervene *ex mero motu*. We conclude that it was not.

The prosecutor ended the State's closing argument as follows:

If these defense lawyers try to say to you that you're committing murder yourselves, you remember where you were on April the 2nd, 1994, getting ready for Easter vacation, you weren't over on Brownsboro Road, all you are doing, Members of the Jury, is applying the law of the State of North Carolina to the facts of this case, which all of you said that you could do.

And I ask you to impose the sentence of death in this case. And you remember the last words Trae Gibson said, Yo I love you.

Thus, the prosecutor cast the deceased's final words as having been spoken to her daughter, Yoshomira, who was also known as "Yo Yo."

We have found no impropriety on numerous occasions in which prosecutors argued from the victim's perspective where the argument was supported by the evidence. *See State v. King*, 299 N.C. 707, 711-13, 264 S.E.2d 40, 43-44 (1980) (prosecutor's closing argument as to what victim must have been thinking as he was dying not grossly improper); *State v. Hunt*, 339 N.C. 622, 651-52, 457 S.E.2d 276, 293 (1994) (prosecutor's closing argument concerning what the victim was thinking while kneeling, bleeding, and gasping for breath and that victim's life plans cut short not grossly improper); *State v. Frye*, 341 N.C. 470, 461 S.E.2d 664 (1995) (what victims must have thought as defendant committed crime not grossly improper), *cert. denied*, ―― U.S. ――, 134 L. Ed. 2d 526 (1996).

The evidence presented at trial established that Yo Yo was Trae Gibson's only child and was fourteen months old at the time of her mother's murder. Tammy May testified that the victim was a good mother to her daughter and that May and the victim had planned an Easter egg hunt for the children for the day after the victim was

killed. The child was found on the bed, eyes swollen and red from crying, just a few feet from her mother's body.

From the evidence in this case, we conclude it was reasonable to infer that Trae Gibson's last words would have been to express her love for her child. Although the prosecutor's argument touched upon facts not specifically testified to, we conclude that it was a reasonable inference based on the evidence and was within the wide latitude properly given counsel in argument. *State v. Syriani*, 333 N.C. 350, 398-99, 428 S.E.2d 118, 145, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Assuming *arguendo* that this argument by the prosecutor was error, it was not so grossly improper as to require the trial court to intervene *ex mero motu*. This argument is without merit.

**[13]** Defendant next argues that the prosecutor made an improper argument based on the general public's fear of violent crime and on the jurors' own fears of violent crime. As defendant made no objection to this argument at trial, we review it for gross impropriety and find none.

The prosecutor held up a picture of the exterior of the victim's apartment building and argued that of all the pictures, that one was the most grotesque because "she was where we all think we can go and be safe." The prosecutor continued arguing the sanctity of the home, ending with "and that's why this is grotesque, cause it tells each and every one of you you are safe nowhere now. You're safe nowhere."

We have recognized as appropriate the sanctity of the home argument when it is supported by the evidence. *See Brown*, 320 N.C. at 202, 358 S.E.2d at 17 (argument regarding sanctity of the home not improper deterrence argument where founded upon evidence that the killing took place in the victim's home). This argument was based on evidence that Gibson was murdered while in her apartment, alone with her daughter, where she had a right to feel safe. The prosecutor's argument was within the wide latitude afforded counsel in hotly contested cases and was amply supported by the evidence. The trial court did not err by failing to intervene *ex mero motu*. This argument is without merit.

**[14]** Defendant next contends that the prosecutor made several improper arguments implying that the State was disadvantaged by the law governing capital sentencing. Arguing that the State is

restricted by statute in the aggravating circumstances that it can submit, the prosecutor argued that the defendant may submit many nonstatutory mitigating circumstances. The prosecutor's argument was as follows:

> If he helped an old lady across the street when he was thirteen years old, they can argue that to you.
>
> [DEFENSE COUNSEL]: OBJECTION.
>
> THE COURT: OVERRULED.
>
> [PROSECUTOR]: If he bought his grandmother a Happy Meal at McDonald's at some time in his life, they can argue that to you.
>
> So they are not limited in any respect. They can submit a thousand if they want to.

The prosecutor further stated that "we know that the rules are stacked against us," to which defendant did not object. Defendant argues that these arguments injected an arbitrary and irrational element into the case that influenced the sentencing decision and prejudiced him in this case. We disagree.

The prosecutor's argument regarding nonstatutory mitigating circumstances emphasized to the jury that it must hold the State to a higher burden than it holds defendant. This argument could not have prejudiced defendant. Moreover, the jury found two statutory mitigating circumstances, including the catchall, as well as two nonstatutory mitigating circumstances. As to the "rules are stacked against us" argument, we do not find this to be so grossly improper that the trial court erred by failing to intervene *ex mero motu*. This argument is without merit.

[15] Finally, defendant argues that the prosecutor made several arguments improperly referring to what a life sentence would be like and stated that it would not be adequate to deter other murders. Defendant did not object to these arguments. We have considered and rejected defendant's general deterrence argument previously. In *State v. Alston*, 341 N.C. 198, 252, 461 S.E.2d 687, 717 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996), we held that argument about the conditions of life in prison "did not relate to general deterrence, but served to emphasize the State's position that defendant deserved the death penalty rather than a comfortable life in prison." We see no reason to depart from this decision. This argument is without merit.

**STATE v. WOODS**

[345 N.C. 294 (1997)]

**[16]** In the conclusion of his first assignment of error, defendant argues that the prosecution's conduct was overly zealous and that the cumulative effect of the instances he complains of denied him due process, requiring resentencing. We disagree.

In order for a defendant to receive a new sentencing proceeding, the prosecutor's comments must have so infected the trial with unfairness as to make the result a denial of due process. *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986). We do not find this to be the case. Nor has defendant shown that the arguments "stray[ed] so far from the bounds of propriety as to impede the defendant's right to a fair trial." *State v. Davis*, 305 N.C. 400, 421-22, 290 S.E.2d 574, 587 (1982). For the foregoing reasons, we conclude that the cumulative effect of the arguments of the prosecutor during the capital sentencing proceeding in this case, which are the subject of this assignment of error, did not create prejudicial error. Accordingly, this assignment of error is overruled.

**[17]** By another assignment of error, defendant contends that the trial court erred by excusing prospective juror Scott Klein for his responses to death-qualification questions when his responses did not disqualify him for jury service. We disagree. After receiving ambivalent responses during the *voir dire* regarding Klein's ability to impose the death penalty, the trial court questioned Klein from the bench in the following exchange:

THE COURT: Let me ask you this, would your views about the death penalty impair your ability to be fair and impartial to the State or to the Defendant in determining whether or not a sentence of death o[r] life imprisonment should be imposed?

[MR. KLEIN]: To be fair to all involved, I would have to say in the absence of experience of having done so before, that it, I would have to say that it would be substantial, that there would be substantial ahh—that there would be a problem with my serving.

THE COURT: There would be some impairment of your ability to view the evidence impartially and applying the law impartially under the law of North Carolina?

MR. KLEIN: Ultimately because of my uncertainty I would have to say yes, simply because I'm not sure.

After further questioning by defense counsel and again by the prosecutor, the trial court took one last opportunity to clarify whether

Klein's views would substantially impair his ability to perform his duties as a juror:

> THE COURT: Mr. Klein do you believe your reluctance, expressed reluctance to impose the death penalty would impair your ability to be fair and impartial in determining the sentence in this case according to the law?
>
> MR. KLEIN: I would fear it might.
>
> THE COURT: Okay[.] Do you have some significant or substantial fear?
>
> MR. KLEIN: I would have to say so under the circumstances.

The trial court then excused Klein for cause.

Defendant contends that Klein was fit to serve on the jury because he stated at one point during the *voir dire* that he would apply the law as it was given to him. Viewed in its entirety, the *voir dire* of Klein shows that the trial court properly excused him for cause. *State v. Jones*, 336 N.C. 229, 247, 443 S.E.2d 48, 56, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 423 (1994). This assignment of error is overruled.

[18] By his next assignment of error, defendant contends that the trial court improperly denied his motion to allow the jury to consider life without parole as a sentencing option. Defendant argues that this violated his constitutional right to due process. We disagree.

Defendant argues that he was entitled to an instruction that a sentence of life imprisonment "means a sentence of life without parole." The General Assembly amended N.C.G.S. § 15A-2002 to require such an instruction in capital sentencing proceedings for offenses occurring on or after 1 October 1994. This Court has recognized that the legislature intended for N.C.G.S. § 15A-2002 to become effective 1 October 1994 and to be applied prospectively. *State v. Skipper*, 337 N.C. 1, 43, 446 S.E.2d 252, 275 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995); *State v. Fullwood*, 343 N.C. 725, 741, 472 S.E.2d 883, 891 (1996). In *Fullwood*, we rejected the same argument defendant raises in this assignment of error. We see no reason to depart from this sound holding. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant also raises for "preservation" the following five issues: (1) the trial court's instructions which permitted jurors to reject sub-

**STATE v. WOODS**

[345 N.C. 294 (1997)]

mitted mitigation on the basis that it had no mitigating value were erroneous; (2) the trial court's use of the term "may" in sentencing Issues Three and Four made consideration of proven mitigation discretionary with the sentencing jurors; (3) the court committed reversible constitutional error by submitting to the jury the "especially heinous, atrocious, or cruel" aggravating circumstance based upon instructions that failed adequately to limit the application of this inherently vague and overly broad circumstance; (4) the trial court violated defendant's right to due process of law and to be free of cruel and unusual punishment by refusing to give an accurate instruction on parole eligibility; and (5) the trial court violated defendant's rights to a fair and impartial jury, to due process of law, and to be free of cruel and unusual punishment by failing to prevent the prosecutor from asking each prospective juror if he or she believed capital punishment "necessary," which improperly raised the issue of general deterrence. We have previously rejected defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule each of these assignments of error.

## PROPORTIONALITY REVIEW

[19] Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (Supp. 1996). After thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the evidence fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In the case *sub judice*, defendant pled guilty to first-degree murder. The jury found the following two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel, N.C.G.S.

STATE v. WOODS

[345 N.C. 294 (1997)]

§ 15A-2000(e)(9), and that defendant killed the victim while he was engaged in the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5). In mitigation, one or more jurors found the statutory mitigating circumstances that defendant's capacity to appreciate the criminality of or to conform his conduct to the law was impaired, N.C.G.S. § 15A-2000(f)(6). The jury also found the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). The jury found as nonstatutory mitigating circumstances that defendant had acknowledged wrongdoing in connection with the offense within two days of its commission and that defendant was alcohol and cocaine dependent at the time of the murder.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181; *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). None of the seven cases in which this Court has found the death penalty disproportionate is factually similar to the present case.

This case has several features which distinguish it from the cases in which we have found the death penalty to be disproportionate. They are: (1) defendant inflicted incise wounds on the victim, consistent with torture, before leaving her to bleed to death; (2) defendant murdered the victim just a few feet away from where the victim's infant daughter sat; and (3) the victim was bound, gagged, cut, stabbed, and burned and would have suffered tremendously before dying. We find it significant that in none of the cases in which this Court has found the death penalty disproportionate did the defendant engage in torture of the victim, or do so in front of the victim's infant child.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. This case is factually

similar to *State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802. In that case, the defendant entered the home of a woman he did not know and ordered her to send her two-and-a-half-year-old child from the room before viciously assaulting the woman. After torturing her with sharp instruments, the defendant put a pillowcase over the victim's head and fired into the pillowcase.

In the present case, defendant entered the victim's home and repeatedly stabbed her, cut her skin in a manner consistent with torture, and burned her with a curling iron while she was bound and gagged, all in front of her infant daughter. We also note that defendant left the victim to bleed to death. As we stated in *Reeves*, we can imagine the helplessness and terror Trae Gibson must have felt as she endured this torture, knowing that she was going to die, leaving her fourteen-month-old child in the hands of her killer. We found the death sentence to be proportionate in *Reeves* and we find it to be proportionate in this case. Accordingly, we conclude that the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

For the foregoing reasons, we hold that defendant received a fair capital sentencing proceeding, free of prejudicial error, and that the sentence of death entered in the present case must be and is left undisturbed.

NO ERROR.