STATE OF NORTH CAROLINA v. JOHNNY DEAN LEE

No. 544PA96

(Filed 9 July 1998)

1. Evidence and Witnesses § 287 (NCI4th)— prior bad acts— admission not plain error

The trial court did not commit plain error by admitting evidence of defendant's prior bad acts in a prosecution for first-degree sexual offense and first-degree murder of a child. Testimony by the child's mother that defendant bought marijuana during the week of the child's death and a detective's testimony that the mother had said that defendant was a "pot" smoker and drank alcohol was inconsequential to the determination of whether defendant committed the murder and could not have denied a fundamental right of the defendant. Further, statements that defendant made to an investigator that he had gotten into a fight and was convicted of assault several years earlier in Colorado was not especially probative of whether he repeatedly abused and sexually assaulted a small child, and admission of this

evidence could not have created a miscarriage of justice in light of other evidence showing that defendant repeatedly abused the child, including admissions by defendant that he caused several bruises apparent on the child victim's body. N.C.G.S. § 8C-1, Rule 404(b).

**2. Evidence and Witnesses § 3164 (NCI4th)— prior consistent statements—corroboration—exception to hearsay rule**

In a prosecution for first-degree murder of a child, the trial court properly admitted under the prior consistent statement exception to the hearsay rule statements made by the victim's mother to a detective that her husband was afraid defendant would beat up her minor child, that she believed defendant may have done something to the child, that defendant got mad because he believed the child's autopsy report was wrong, that she knew defendant injured the child, and that she and defendant tried to get their stories straight, since all of the statements corroborate and add weight to the mother's trial testimony. Although the mother's statement to the detective that defendant said he was abused as a child did not corroborate any trial testimony, the erroneous admission of this statement did not constitute plain error.

**3. Criminal Law § 467 (NCI4th Rev.)— closing argument— hypothetical thoughts of defendant and victim—inferences supported by evidence**

In this prosecution for first-degree murder of a child, closing argument statements by the prosecutor which were offered as hypothetical thoughts that defendant and the victim may have made during the week of the homicide were reasonable inferences drawn from the evidence and did not require intervention by the trial court *ex mero motu*.

**4. Criminal Law § 439 (NCI4th Rev.)— closing argument— characterizations of defendant as bad, mean, dangerous— inferences from evidence**

The prosecutor's characterizations of defendant as "mean" and "bad" in closing argument statements of hypothetical thoughts of the child murder victim during the last week of his life were reasonable inferences based on testimony by the child's mother that defendant had bruised the child. Further, the prosecutor's characterization of defendant as a dangerous man during closing argument was also a reasonable inference which may

have been derived from testimony by the child's mother and various expert witnesses that the child was abused. Therefore, these arguments did not require the trial court to intervene *ex mero motu*.

### 5. Homicide § 261.1 (NCI4th)— murder by torture—sufficient evidence

The State's evidence was sufficient to support defendant's conviction for first-degree murder by torture of a two-year-old child where it tended to show that, during a one-week period, the child consistently emerged from defendant's care with myriad bruises, many of which defendant admitted to causing under the guise of either punishment or protection; on Saturday, 23 October 1993, defendant hit the child to punish him; on the following Monday, the child had visible bruises on both sides of his face after spending six hours alone with defendant on Sunday; on Wednesday, after being alone with defendant for four hours, the child had new bruises on his arm and visible bruises on both sides of his neck, he was vomiting, he had diarrhea, and his eyes were crossed; four doctors testified that the child's death was the result of a brain injury which caused massive bleeding in his brain; each doctor testified that the bruises and head injury did not appear accidental but were more likely the result of severe child abuse, battered child syndrome, or shaken baby syndrome; one doctor testified that the child probably died around 2:00 a.m. on Friday morning based on the amount of blood that was in his brain; and the child's mother testified that she saw defendant standing over the child that night between midnight and 5:00 a.m.

### 6. Rape and Allied Offenses § 107 (NCI4th)— first-degree sexual offense—sufficient evidence

The State's evidence was sufficient to support defendant's conviction of first-degree sexual offense against a two-year-old child where it tended to show that when the child was discovered dead on Friday morning from a brain injury inflicted by defendant, he had a tear in his rectum that was about two inches into his anal canal, skin abrasions adjacent to the anal opening were apparent, and there was mucus and blood around his anus; the child had no anal injury when he was examined by a doctor on Thursday; a pathologist testified that it was likely that the child was penetrated by an object that was two to three inches in length and three-fourths of an inch in diameter while he was still

alive; the child was left alone with defendant from 6:00 p.m. until 10:00 p.m. on Thursday night because his mother had to be at work; when the mother returned home, she noticed that the child's underpants were wet; she removed the pants and placed a towel over the lower half of his body; and later that night, she awoke to find defendant standing over the child. The jury could reasonably find that defendant sexually assaulted the child on Thursday night, when he was in the exclusive care of defendant, or Friday morning when the child's mother saw defendant standing over him.

**7. Constitutional Law § 286 (NCI4th)— ineffective assistance of counsel—required showing**

To establish ineffective assistance of counsel, the defendant must show (1) that counsel's performance fell below an objective standard of reasonableness as defined by professional norms, and (2) that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error.

**8. Constitutional Law § 306 (NCI4th)— character evidence— counsel's failure to object—not ineffective assistance**

Defendant was not denied the effective assistance of counsel by his attorney's failure to object to character evidence regarding defendant's prior assault, probation, alcoholism and marijuana use where all of this evidence was admissible except for one item, and defendant was not denied a fair trial by the admission of this one item.

**9. Constitutional Law § 306 (NCI4th)— photographs—counsel's failure to object—not ineffective assistance**

A defendant on trial for the first-degree murder of a child was not denied the effective assistance of counsel by his attorney's failure to object to four photographs of defendant's living room which showed two small signs and a mannequin head with a knife through it where the photographs were authenticated, relevant and admissible to show the circumstances of the child's death, to illustrate testimony of the child's mother, and to show how the child could have injured himself in defendant's home. The mere fact that defendant owned what he now considers inappropriate items and that the photographs displayed these objects does not make the photographs inadmissible.

**10. Constitutional Law § 306 (NCI4th)— hearsay statements—counsel's failure to object—admissible or harmless error—not ineffective assistance**

Defense counsel's failure to object to hearsay testimony was not negligent conduct and therefore did not constitute ineffective assistance of counsel where all of the hearsay statements except the first were admissible as prior consistent statements which corroborated a witness's trial testimony, and the admission of the first statement constituted harmless error.

On writ of certiorari pursuant to N.C.G.S. § 7A-32 to review a judgment imposing a sentence of life imprisonment entered by Sitton, J., on 31 March 1995 in Superior Court, Catawba County, upon a jury verdict of guilty of first-degree murder and first-degree sexual offense. Heard in the Supreme Court 20 November 1997.

*Michael F. Easley, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Jonathan P. Babb, Assistant Attorney General, for the State.*

*J. Scott Hanvey for defendant-appellant.*

ORR, Justice.

On 6 December 1993, defendant was indicted for first-degree murder in violation of N.C.G.S. § 14-17 and first-degree sexual offense in violation of N.C.G.S. § 14-27(a)(1). Defendant pled not guilty to both charges. On 29 March 1995, the jury returned verdicts of guilty as charged on both counts. Following a sentencing hearing, the jury recommended that defendant receive a sentence of life imprisonment for the first-degree murder conviction. Thereafter, the trial court sentenced defendant to two consecutive life terms for the convictions.

On 31 March 1995, defendant filed notice of appeal. In accordance with Rule 25 of the North Carolina Rules of Appellate Procedure, an order was entered on 19 March 1996 dismissing defendant's appeal because he had failed to perfect it within the time period allowed. Having lost his statutory right to appeal, defendant filed a petition for writ of certiorari to this Court pursuant to Rule 21 of the North Carolina Rules of Appellate Procedure. We granted review on 7 February 1997.

Based substantially on the testimony of Brenda Finch, the evidence presented at trial tended to show the following facts. In

January 1993, defendant began having an extramarital affair with Brenda Finch. Brenda was married to Brian Finch and had one child from the marriage, Robbie, the two-year-old victim in this case who was murdered and sexually assaulted.

In October 1993, Brenda left her husband Brian and moved into defendant's home. She left Robbie in the care of his natural father upon leaving the marital home. Two weeks later, on Friday, 22 October 1993, Brenda picked Robbie up from a sitter and took him to defendant's home. No incidents occurred on that Friday. On the following day, however, Brenda heard Robbie scream while she was inside defendant's house. Brenda had gone inside the house for only a moment, leaving Robbie and defendant alone in the front yard. When Brenda asked what happened, defendant asserted that he had to "tap" Robbie on the behind because the child had gotten too close to the road.

The following Sunday, 24 October 1993, another incident occurred. At approximately 4:00 p.m., Brenda went to work at K-Mart and left defendant to care for Robbie. That evening at 7:00 or 8:00 p.m., she called defendant from work to inquire about Robbie. Defendant told her that he could not talk at the moment because Robbie had fallen out of the bathtub, hit his head pretty hard, and was screaming. At 10:00 p.m., Brenda arrived home and found Robbie sleeping on the couch. The next morning, she noticed a bruise on each side of Robbie's face. Defendant said that the bruise on the left side of his face was from Robbie's falling out of the bathtub. The other bruise, he said, resulted from defendant accidentally hitting Robbie in the face with a door that he opened, not knowing that Robbie was behind it. Both injuries occurred while Robbie was in defendant's exclusive care from 4:00 to 10:00 p.m. on that Sunday.

On Monday, Brenda went to work at about 6:00 p.m. and left Robbie in the care of his natural father, Brian. Brian saw the bruises on his son's face and immediately became very upset. Brenda explained to Brian that defendant had told her that the injuries were accidental. Brian responded by explaining that he did not want it to happen again. Later that evening, however, Brian took Robbie to visit three neighbors and asked each neighbor to look at Robbie's bruises. He discovered also that evening that his electricity had been cut off and therefore returned Robbie to Brenda at about 8:00 or 8:30 p.m. after she had gotten off work.

On Tuesday, 26 October 1993, Brenda stayed home with Robbie for most of the day. In the afternoon, she left Robbie with Brian while she did laundry for two hours. At this point, both Brenda and Brian noticed that Robbie was behaving strangely. Brenda saw Robbie walk directly into a door, and Brian noticed that Robbie, a typically active child, was lethargic and not interested in toys or other people. Despite these observations, Brenda took Robbie back to defendant's home and put him to bed.

On Wednesday, 27 October 1993, Brenda asked defendant to take care of Robbie for a few hours while she retrieved her property from Brian's home. Robbie remained in defendant's care for about two hours while Brenda was gone. After moving, Brenda again left Robbie in defendant's care for about an hour while she went to a job interview. Upon returning from the interview, Brenda saw that Robbie had two new bruises on his arm and new bruises on both sides of his neck. In contrast to how she had left him, he was now also vomiting, he had diarrhea, and his eyes were crossed. After inquiring about what happened to bring about these changes in Robbie, defendant admitted that he may have caused the bruises. The bruise on Robbie's arm, he said, came from his grabbing Robbie too tight when he tried to stop him from falling off the couch. The neck bruises, he said, were possibly caused by his holding Robbie too tight under his chin while he wiped his nose. Brenda gave Robbie medicine for the vomiting and decided to take him to the emergency room the next morning. That evening, she stayed up with him all night because he woke up every hour wanting something to eat or drink.

The next day at about noon, Brenda took Robbie to the emergency room at Catawba Memorial Hospital where Dr. Steven Williamson examined him. Dr. Williamson noted the bruises on Robbie's face and neck and his difficulty in walking straight. After a CAT scan was taken, Dr. James Owsley, the attending radiologist, read it as being normal. This reading was later found to be incorrect because the report did show bleeding in Robbie's brain. At the time, however, there was no explanation for the problems that Robbie was experiencing. Dr. Williamson, who remained troubled by the symptoms, made an appointment for Robbie with a pediatrician for the following morning at 8:00 a.m. Robbie was released at about 2:30 or 3:00 p.m., and he and Brenda returned to defendant's home.

Three hours later, Brenda went to work at K-Mart and left Robbie in defendant's care once again. When she arrived home at about 10:00

p.m., she found Robbie sleeping on the couch. His pants were soaking wet, which was unusual because Robbie was potty trained and did not typically wet himself. After removing the wet pants, Brenda placed a towel across Robbie, and then she and defendant went to bed. This was at about midnight. Brenda could hear Robbie snoring in the other room as she dozed off. At some point during the night, Brenda woke up and saw defendant standing over Robbie. She asked defendant if Robbie was all right, and he replied that Robbie was fine. After this exchange, both Brenda and defendant went back to sleep. At about 5:00 a.m., however, Brenda woke up, checked on Robbie, and thought that he looked dead. Brenda yelled to defendant to call 911, but he said that he did not believe that 911 could do anything. Brenda then called 911. The police and paramedics subsequently arrived and took Robbie to Glen R. Frye Hospital, where he was pronounced dead. Later, it was determined that Robbie died from head trauma that resulted in massive bleeding over the surface of both sides of his brain causing a subdural hematoma and compression of the brain stem.

Several physicians testified to the myriad bruises and injuries found on Robbie's body on the morning of his death. Dr. Dennis Kimbleton observed Robbie that morning and said that he had bruises on his face, chin, jaw, arms, knee, hip, shoulders, and lower leg. Dr. Sara Sinal, a pediatrician, testified to the large number of bruises and explained that the location of the bruises indicated that the injuries were not inadvertent. Also, Dr. Sinal stated that the brain injury that Robbie had was a common injury in child abuse cases and that based on that injury as well as the other physical traumas, she believed that Robbie had died from battered child syndrome. Dr. James Parker, the pathologist who performed the autopsy, testified that in his opinion Robbie had been physically abused and that the two severe brain hemorrhages were the result of trauma to the skull from a blunt object, such as a club, bat, or hand. Dr. Sam Auringer, another State witness, testified that bleeding between the hemispheres of a child's brain is a relatively specific sign for child abuse due to shaking and that in his opinion, Robbie had been severely abused. Dr. Gregory Davis reviewed the autopsy report, CAT scan, and photographs and testified that, in his opinion, Robbie died as a result of child abuse. Dr. Davis also stated that the injuries were not the kind that would result from falling out of a bathtub; he explained that the brain injury was indicative of child abuse and that the location and pattern of the bruises on Robbie's body indicated that the injuries were not accidental.

Dr. Kimbleton and Dr. Parker also testified to an anal injury that was discovered on Robbie on the morning of his death. Dr. Kimbleton observed that Robbie's rectum was bruised and stretched and that there was blood in his rectal canal and a smear of blood in the crease between his right and left buttock. Dr. Parker, when performing the autopsy, also observed this tear in the lining of Robbie's rectum and noticed that his anal canal was dilated wider than normal. A Caucasian hair, not matching defendant's hair, and several dark pubic hairs were found in the area of Robbie's buttocks.

**[1]** In defendant's first assignment of error, he asserts that the trial court erred by admitting evidence of prior bad acts, thus violating Rule 404(b) of the North Carolina Rules of Evidence. Having not objected to this evidence at trial, defendant alleges this error for the first time on appeal under the plain error rule. The plain error rule holds that the Court may review alleged errors affecting substantial rights even though the defendant failed to object to admission of the evidence at trial. *State v. Cummings*, 346 N.C. 291, 313, 488 S.E.2d 550, 563 (1997), *cert. denied*, — U.S. —, — L. Ed. 2d —, 66 U.S.L.W. 3491 (1998). This Court has chosen to review such "unpreserved issues for plain error when Rule 10(c)(4) of the Rules of Appellate Procedure has been complied with and when the issue involves either errors in the trial judge's instructions to the jury or rulings on the admissibility of evidence." *Id.* at 313-14, 488 S.E.2d at 563. The rule must be applied cautiously, however, and only in exceptional cases where

> "after reviewing the entire record, it can be said the claimed error is a *'fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' . . . ."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnotes omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). Thus, the appellate court must study the whole record to determine if the error had such an impact on the guilt determination, therefore constituting plain error. *Id.* at 661, 300 S.E.2d at 378-79.

A review of the evidence in the present case reveals that this is not the exceptional case where such a pervasive defect or plain error occurred which would have tainted all results and denied defendant a right to a fair trial. Defendant alleges that admission of statements that he made to Investigator John Little in a taped interview about his prior assault conviction, probation, and alcoholism violated Rule 404(b). The taped interview, which was played for the jury in its entirety, contained the following:

> Defendant Lee:  . . . I still told the patrol officer that was there I'm on probation. In 1988, I was out in Colorado and a guy and I got into a fight and I got the better part of the deal, and the Colorado police didn't like the fact that I came from North Carolina and beat up on the people out there. And, at that time, I was a serious heavy drinker. Since then, I changed that and I cleaned up my act.

> [Investigator] Little:  Okay.

> Defendant Lee:  My probation officer, Ralph Pittman, he has that information.

Defendant Lee states later:

> I, I, don't have any children. It's in my brain, you know, there's some research that alcoholism is genetic and all that, so I'm like that's not a gene I care to pass on.

In addition to statements from the taped interview, defendant alleges that Brenda Finch's testimony that defendant bought marijuana during the week of Robbie's death was inadmissible. Finally, defendant argues that the trial court improperly admitted Detective Rob Ennis' testimony that Brenda Finch said that defendant was a "pot" smoker and drank alcohol. Admission of this evidence is simply not so fundamental or prejudicial that a miscarriage of justice has occurred. Evidence that defendant drank alcohol and smoked "pot" is inconsequential to the determination of whether defendant committed the murder. There is no way that this evidence could have amounted to a grave error which denied a fundamental right of the accused.

Similarly, admission of the evidence that defendant got into a fight and was convicted for it several years ago in Colorado is not especially probative of whether he repeatedly abused and sexually assaulted a small child. In the wake of other evidence showing that defendant repeatedly abused the child, including admissions by defendant that he caused several bruises apparent on the victim's

body, admission of this evidence certainly could not have created a miscarriage of justice. We conclude that plain error did not occur, thus, this assignment of error is overruled.

[2] In his second assignment of error, defendant argues that the trial court committed plain error by admitting Detective Rob Ennis' testimony regarding statements Brenda Finch made to him in an interview on 2 February 1995. Defendant argues that this evidence constitutes inadmissible hearsay and that the trial court improperly allowed the statements in evidence under the prior consistent statement exception to the hearsay rule.

Under Rule 801 of the North Carolina Rules of Evidence, hearsay is defined as a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. N.C.G.S. § 8C-1, Rule 801(c). "Any hearsay statement as defined in Rule of Evidence 801(c) is inadmissible except as provided by statute or the Rules of Evidence." *State v. Pickens*, 346 N.C. 628, 644, 488 S.E.2d 162, 171 (1997). One exception to the general bar against admitting hearsay is the prior consistent statement exception to the hearsay rule. Under this exception in North Carolina, there is a liberal policy in allowing prior consistent statements to be admissible even when the witness has not been impeached. *State v. Taylor*, 344 N.C. 31, 48, 473 S.E.2d 596, 606 (1996). To be admissible, the prior consistent statement must first, however, corroborate the testimony of the witness. *State v. Singletary*, 344 N.C. 95, 107, 472 S.E.2d 895, 902 (1996). To constitute corroborative evidence,

> the prior statement of the witness need not merely relate to specific facts brought out in the witness's testimony at trial, so long as the prior statement in fact tends to add weight or credibility to such testimony. Our prior statements are disapproved to the extent that they indicate that additional or "new" information, contained in the witness's prior statement but not referred to in his trial testimony, may never be admitted as corroborative evidence. However, the witness's prior statements as to facts not referred to in his trial testimony *and not tending to add weight or credibility* to it are not admissible as corroborative evidence. Additionally, the witness's prior contradictory statements may not be admitted under the guise of corroborating his testimony.

*State v. Ramey*, 318 N.C. 457, 469, 349 S.E.2d 566, 573-74 (1986) (citations omitted).

In the instant case, defendant contends that the trial court erred by allowing Detective Rob Ennis to testify that: (1) Brenda Finch told him that defendant said he was abused as a child, (2) Brenda Finch told him that her husband was afraid defendant would beat up her minor child, (3) Brenda Finch told him that she believed defendant may have done something to Robbie, (4) Brenda Finch told him that defendant got mad because he believed Robbie's autopsy report was wrong, (5) Brenda Finch told him she knew defendant injured the victim, and (6) Brenda Finch told him she and defendant tried to get their stories straight.

Contrary to defendant's contention, all of the above statements save the first item are admissible in evidence as prior consistent statements which corroborate and add weight to the trial testimony of Brenda Finch. The second statement, concerning Brian Finch's belief that defendant would beat up Robbie, adds credence to Brenda's testimony that she told Brian about Robbie's bruises and that Brian got very upset about them. The statement also adds weight to Brenda's testimony that she immediately told Brian that the injuries were an accident because she did not want Brian to think defendant beat up Robbie. The third statement, in which Brenda admitted that defendant might have done something to Robbie, corroborates Brenda's testimony about defendant admitting to her that he had grabbed Robbie and was therefore responsible for putting the bruises on Robbie's arm and chin. The fourth statement, which concerned defendant believing that the autopsy report was wrong, corroborates Brenda's testimony that she had read the autopsy report three weeks after Robbie's death and had confronted defendant with the autopsy report. The fifth statement, in which Brenda said that she knew defendant injured Robbie, corroborates Brenda's testimony that defendant admitted to inadvertently causing Robbie's bruises. The sixth statement in its entirety read: "She said in the past [that defendant] had asked her a lot of questions about the times and dates that she [had] noticed Robbie's bruising period. She said it was like he was wanting to get their stories straight." This statement adds weight to Brenda's testimony that she still loved defendant and did not believe until he was incarcerated that he had abused or harmed Robbie. Finally, although the first item concerning defendant being abused as a child did not corroborate any trial testimony, this error clearly did not constitute plain error. Having found that five of the statements were admissible and that the sixth statement failed to constitute plain error, we therefore conclude that this assignment of error is also without merit.

**[3]** In his third assignment of error, defendant contends that the trial court erred by failing to intervene during the prosecutor's closing argument when the prosecutor made arguments allegedly unsupported by evidence. Defendant argues that the prosecutor stated that defendant and the victim made certain statements when there was no evidence to indicate that defendant or the victim made such statements. As defendant failed to object to the prosecutor's argument at trial, we are limited to determining "whether the argument was so grossly improper that the trial court erred by failing to intervene *ex mero motu*." *State v. Woods*, 345 N.C. 294, 312, 480 S.E.2d 647, 655, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 132 (1997). We find that it was not.

The prosecutor argued that:

(1) Defendant said, "Ain't no use in giving that kid CPR, he's dead, but I got to do something, can't just sit here."

(2) Defendant said, "I don't want this kid around, don't you understand, Brenda."

(3) Defendant said, "Knowing that I might hurt this kid. Who cares. He ain't mine. Well, I'll get rid of this pain, hit him. That's what I got for you, boy."

(4) Defendant said, "Went too far, killed him. Should have known I was going to. I intentionally put those bruises on him. Damn. First Degree Sex Offense."

(5) Defendant said, "Better take the kid to the hospital. Because I just knocked him. Might be suffering from brain damage. Cover my tracks."

(6) Defendant said, "Hey Robbie, how you doin' old boy? Wake up. Wake up. Wake up, you little bastard."

(7) Defendant said, "Get him out of the way; I want mama to myself and, I never blamed it on mama, I never blamed it on Brian, I don't know what happened."

(8) Robbie said, "No, mama, no, don't let him beat me no more. Mama, don't take me in the house, if you take me in there, I'm going to die."

These statements made by the prosecutor during closing argument were not intended as statements of fact, but were instead offered as hypothetical thoughts that defendant and the victim may

have had during the week of the homicide. In the past, we have held that it is not improper for a prosecutor to argue or propose what thoughts the victim may have had while being victimized if the inference is supported by the record. *Id.* We have also held that it is not improper for a prosecutor to argue or suggest to the jury what the defendant may have been thinking in committing a crime when the argument is a reasonable inference based on facts in evidence. *State v. Shank*, 327ʼ N.C. 405, 410-11, 394 S.E.2d 811, 815 (1990). In the instant case, the prosecutor's comments during his closing argument were also reasonable inferences drawn from the evidence. The trial court, therefore, did not err by failing to intervene. Accordingly, this assignment of error is overruled.

[4] In his fourth assignment of error, defendant contends that the trial court erred by failing to intervene *ex mero motu* during closing argument when the prosecutor characterized the defendant as a "mean," "bad," and "dangerous" man. In his closing, the prosecutor hypothesized that the victim may have had the following thoughts during the last week of his life: (1) "I'm going back to where the mean or bad man stays"; and (2) "Mama, don't take me back to the place where the bad man lives." The prosecutor also argued during his closing that defendant should be considered a dangerous man.

Once again, because defendant did not object to these arguments at trial, the standard of review is whether the argument was so grossly improper that the trial court erred by failing to intervene *ex mero motu*. *State v. Woods*, 345 N.C. at 312, 480 S.E.2d at 655. As previously discussed, it is not improper for the prosecutor to argue what thoughts the victim could have had as long as the argument is a reasonable inference based on the evidence. *State v. Woods*, 345 N.C. at 305, 480 S.E.2d at 651. In this case, the two hypothetical thoughts that the prosecutor argued the victim may have had are both reasonable inferences based on the evidence. Both statements could be drawn from Brenda Finch's trial testimony that defendant bruised Robbie. Due to the bruising, Robbie could have had fearful thoughts about defendant and not have wanted to be left alone with him. The prosecutor's characterization of defendant as dangerous is also a reasonable inference which may have been derived from Brenda Finch's testimony that defendant bruised Robbie or from the various expert witnesses who testified that Robbie was abused. Clearly, these arguments were not so grossly improper as to require the trial court to intervene *ex mero motu*. Accordingly, this assignment of error is overruled.

[5] In his fifth assignment of error, defendant contends that the trial court erred in denying his motions to dismiss the first-degree murder conviction made at the close of the State's case and at the close of all the evidence submitted at trial. Defendant argues that the court should have granted his motions because there was insufficient evidence to support the murder conviction. Defendant asserts that the State failed to offer any direct evidence linking him to the homicide and therefore raised only a suspicion of guilt. We shall consider only the appeal of the denial of the motion made at the close of all the evidence since defendant introduced evidence at trial and therefore waived his right to appeal the motion made at the close of the State's case. N.C.G.S. § 15-173 (1983); *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990).

To survive a motion to dismiss, the State must offer substantial evidence of each essential element of the offense and substantial evidence that defendant is the perpetrator. *State v. Cross*, 345 N.C. 713, 716-17, 483 S.E.2d 432, 434 (1997). Substantial evidence is defined as relevant evidence which a reasonable mind could accept as adequate to support a conclusion. *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995). When deciding whether substantial evidence exists, " 'the trial judge must view all the evidence, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it and resolving any contradiction in the evidence in its favor.' " *State v. McCullers*, 341 N.C. 19, 28-29, 460 S.E.2d 163, 168 (1995) (quoting *State v. Abraham*, 338 N.C. 315, 328, 451 S.E.2d 131, 137 (1994)). The motion should not be granted against the State " 'if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction.' " *State v. Stephenson*, 218 N.C. 258, 263, .10 S.E.2d 819, 822-23 (1940) (quoting *State v. Johnson*, 199 N.C. 429, 431, 154 S.E. 730, 731 (1930)). The trial court is "not required to determine that the evidence excludes every reasonable hypothesis of innocence prior to denying a defendant's motion to dismiss." *Franklin*, 327 N.C. at 172, 393 S.E.2d at 787. Also, contradictions and inconsistencies do not warrant dismissal; the trial court is not to be concerned with the weight of the evidence. *Id.* Ultimately, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). If, upon consideration of all the evidence, only a suspicion of guilt is raised, then the evidence is insufficient, and the motion to dis-

miss should be granted. *State v. Wilson,* 345 N.C. 119, 125, 478 S.E.2d 507, 511 (1996).

In this case, the jury found defendant guilty of first-degree murder by torture. "First-degree murder by torture requires the State to prove that the accused 'intentionally tortured the victim and that such torture was a proximate cause of the victim's death.' " *State v. Pierce,* 346 N.C. 471, 492, 488 S.E.2d 576, 588 (1997) (quoting *State v. Stroud,* 345 N.C. 106, 112, 478 S.E.2d 476, 479 (1996), *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 43 (1997)); *see State v. Crawford,* 329 N.C. 466, 479-81, 406 S.E.2d 579, 586-88 (1991)). Torture is defined as " 'the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure.' " *State v. Anderson,* 346 N.C. 158, 161, 484 S.E.2d 543, 545 (1997) (quoting *Crawford,* 329 N.C. at 484, 406 S.E.2d at 589). Course of conduct is defined as " 'the pattern of the same or similar acts, repeated over a period of time, however short, which establish[es] that there existed in the mind of the defendant a plan, scheme, system or design to inflict cruel suffering upon another.' " *Id.* (quoting *Crawford,* 329 N.C. at 484, 406 S.E.2d at 589). The " 'presence or absence of premeditation, deliberation and specific intent to kill is irrelevant' " in determining whether the evidence is sufficient for first-degree murder by torture. *Id.* (quoting *State v. Evangelista,* 319 N.C. 152, 158, 353 S.E.2d 375, 380 (1987)).

When viewing all of the evidence in the light most favorable to the State, we conclude that the trial court did not err in denying defendant's motion to dismiss the murder conviction. The evidence at trial tended to show that defendant intentionally tortured the victim, Robbie Finch, by subjecting him to repeated physical abuse from Saturday, 23 October 1993, to Friday, 29 October 1993, and that this abuse was the proximate cause of Robbie's death. During this one-week period, Robbie consistently emerged from defendant's care with myriad bruises, many of which defendant admitted to causing under the guise of either punishment or protection. On Saturday, 23 October 1993, defendant hit Robbie allegedly to punish him. On Monday, 25 October 1993, Robbie had visible bruises on both sides of his face after spending six hours alone with defendant on Sunday. On Wednesday, 27 October 1993, after being alone with defendant for about four hours, Robbie had new bruises on his arm and visible bruises on both sides of his neck, he was vomiting, he had diarrhea, and his eyes were crossed. This evidence taken together tends to

show that defendant engaged in a course of conduct where he repeatedly abused or tortured Robbie.

The State's evidence also tended to show that Robbie died from a brain injury which was the result of the severe physical abuse. Dr. Sara Sinal, Dr. James Parker, Dr. Gregory Davis, and Dr. Sam Auringer all testified that Robbie's death was the result of a brain injury which caused massive bleeding in his brain. Each doctor also testified that the rampant bruises and head injury did not appear accidental, but were more likely the result of severe child abuse, battered child syndrome, or shaken baby syndrome. In addition, Dr. Parker testified that Robbie probably died around 2:00 a.m. on Friday morning based on the amount of blood that was in his brain. Dr. Parker explained that Robbie would have survived only a few hours after receiving the head injury. Brenda testified that she saw defendant standing over Robbie that night between midnight and 5:00 a.m. Considering all this evidence together in the light most favorable to the State, it seems clear that a jury could reasonably find that defendant committed first-degree murder by torture. Accordingly, this assignment of error is overruled. Defendant has failed to show that there was insufficient evidence to support the murder conviction.

[6] In his sixth assignment of error, defendant argues that the trial court erred in denying his motion to dismiss the first-degree sexual offense conviction. Defendant argues that there was insufficient evidence to support this conviction as well. Again, we find defendant's contention to be without merit. When viewed in the light most favorable to the State, the evidence tended to show that the jury could find that the sexual assault occurred between Thursday afternoon and about 2:00 a.m. on Friday morning when Robbie was still alive. Dr. Williamson, the physician who examined Robbie on Thursday, made no mention of an anal injury. The attending nurse who aided in the exam also made no mention of this injury. No evidence, therefore, suggested that the sexual assault occurred before Thursday night, 28 October 1993.

On Friday morning when Robbie was discovered dead, it was determined that he had a tear in his rectum that was about two inches into his anal canal. Skin abrasions adjacent to the anal opening were apparent, and there was mucus and blood around his anus. According to Dr. James Parker, the pathologist who examined Robbie, it was likely that Robbie was penetrated by an object that was two to three inches in length and three-fourths of an inch in diameter while he was

still alive sometime before 2:00 a.m. on Friday morning. Only Brenda Finch and defendant had access to Robbie from Thursday afternoon until 2:00 a.m. on Friday morning when Robbie died. Robbie was left alone with defendant from 6:00 p.m. until 10:00 p.m. on Thursday night because Brenda had to be at work. When she returned home, she noticed that Robbie's underpants were wet. She removed the pants and placed a towel over the lower half of his body. Later that night, she awoke to find defendant standing over Robbie. Viewing all of this evidence in the light most favorable to the State and taking into consideration evidence that defendant had exclusive access to Robbie, had an opportunity to commit the assault, and had demonstrated ill will toward Robbie by repeatedly bruising him, the jury could reasonably find that defendant sexually assaulted Robbie on Thursday night, when he had exclusive care of him, or Friday morning, when Brenda saw defendant standing over him. Thus, the trial court did not err in denying defendant's motion to dismiss the first-degree sexual offense charge. Accordingly, this assignment of error is overruled.

[7] In his last assignment of error, defendant argues that his Sixth Amendment right to effective assistance of counsel at trial was violated because his attorney failed to make objections to inadmissible evidence. To establish ineffective assistance of counsel, defendant must satisfy a two-prong test which was promulgated by the United State Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984). In *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985), this Court expressly adopted the two-part *Strickland* test as the standard to be applied for ineffective assistance claims. Under this two-prong test, the defendant must first show that counsel's performance fell below an objective standard of reasonableness as defined by professional norms. *Id.* at 561-62, 324 S.E.2d at 248. This means that defendant must show that his attorney made " 'errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *Id.* at 562, 324 S.E.2d at 248 (quoting *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693). Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error. *Id.* at 695, 80 L. Ed. 2d at 698. Thus, defendant must show that the error committed was so grave that it deprived him of a fair trial because the result itself is considered unreliable. *Id.* at 687, 80 L. Ed. 2d at 693.

In the instant case, defendant argues that counsel's failure to object to allegedly inadmissible character and hearsay evidence denied him his right to effective assistance. The character evidence that defendant argues was inadmissible is as follows: (1) testimony regarding defendant's prior assault, probation, alcoholism, and marijuana smoking; (2) testimony that defendant bought marijuana during the week of Robbie's death; and (3) four photographs of defendant's living room, which showed a small sign stating, "Notice. Anyone found here at night will be found here in the morning," and another sign stating, "Tact, the ability to tell a man to go to hell and make him happy to be on the way." Two of the photographs showed a mannequin head on a table in the living room with a knife through it. The hearsay testimony which defendant argues was inadmissible and therefore should have been objected to by his attorney is the same evidence that defendant objected to under his second assignment of error.

[8] Defendant's ineffective assistance claim based on his attorney's failure to object to the character and hearsay evidence must fail. First, all of the character evidence to which defendant's attorney failed to object was admissible evidence except one item. In this opinion, we addressed the admissibility of this same character evidence under the first assignment of error. There, we concluded that all of the testimony concerning defendant's assault, probation, drinking, and marijuana smoking was admissible. Since we concluded that this evidence was admissible, the defense attorney's failure to object to it cannot constitute ineffective assistance. The first part of the *Strickland* test is not satisfied where defendant cannot even establish that an error occurred. The admission, without objection, of evidence that defendant drank alcohol also does not constitute ineffective assistance because even if defendant could show that this error fell below an objective standard of reasonableness, defendant could not show that the error deprived him of a fair trial.

[9] Failure to object to the four photographs also did not constitute ineffective assistance since the photographs were authenticated, relevant, and admissible. All of the photographs of defendant's living room were admissible to show the circumstances of Robbie's death and explain Brenda Finch's trial testimony regarding incidents which occurred at defendant's home. The photographs helped the jury visualize the living room and better understand certain testimony, such as Brenda's testimony about Robbie falling off the living room couch and defendant grabbing him. Brenda also testified about coming

STATE v. LEE

[348 N.C. 474 (1998)]

home from work the night prior to Robbie's death and finding him lying on the living room couch with his pants soaking wet. The photographs were also relevant to show how Robbie could have hurt or injured himself in defendant's home. The photographs were authenticated by Brenda Finch during her testimony, and the judge instructed the jury to consider the exhibits only for the purpose of illustrating her testimony alone. The mere fact that defendant owned what he now considers inappropriate items and that the photographs displayed these objects does not make the photographs inadmissible. "It has long been the law in this State that a photograph, despite its unpleasant depiction, is competent evidence when properly authenticated as representing a correct portrayal of conditions observed by the witness and used to illustrate the witness's testimony." *State v. Lowery*, 318 N.C. 54, 72, 347 S.E.2d 729, 741 (1986). The photographs were admissible, and the failure of his attorney to object to their admission was not error. Since the failure to object to the evidence was not error, defendant again cannot satisfy the first part of the *Strickland* test. Thus, defendant has no ineffective assistance claim on these grounds as well.

[10] Lastly, the failure by defendant's attorney to object to the hearsay evidence was not negligent conduct and therefore did not constitute ineffective assistance. We analyzed the admissibility of the six hearsay statements defendant points to under his second assignment of error. There, we concluded that all of the hearsay statements except the first were admissible as prior consistent statements which corroborated Brenda Finch's trial testimony. Since the items were found to be admissible, it cannot be error for the defense attorney to remain silent. *Lowery*, 318 N.C. 54, 347 S.E.2d 729 (holding that trial counsel properly did not object to testimony as inadmissible hearsay because statements were in fact admissible as statements of a party opponent or statements made by co-conspirators). We also determined in that analysis that admission of the first statement constituted harmless error, and thus, failure to object to its admission could not have deprived defendant of a fair trial. Thus, we conclude that defendant's seventh assignment of error is also without merit.

Having considered and rejected all of the assignments of error presented by defendant, we conclude that defendant's trial was free from prejudicial error. The sentences against defendant should therefore remain undisturbed.

NO ERROR.