IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-880

Filed 18 July 2023

Cumberland County, Nos. 15CRS65388, 15CRS65530, 16CRS55224, 17CRS622

STATE OF NORTH CAROLINA

v.

JAMARKUS MESHAWN SMITH, Defendant.

Appeal by defendant from judgment entered 2 August 2021 by Judge Claire V. Hill in Cumberland County Superior Court. Heard in the Court of Appeals 23 May 2023.

*Marilyn G. Ozer, for defendant-appellant.*

*Attorney General Joshua H. Stein, by Sherri Horner Lawrence, Special Deputy Attorney General, for the State.*

FLOOD, Judge.

Defendant appeals from a jury verdict finding him guilty of, *inter alia*, first-degree murder on the basis of torture. Defendant contends the trial court erred when it (1) denied his motion to dismiss on the basis that proximate cause could not be proven by the State's evidence and (2) admitted testimony from two of the State's experts. We disagree and hold the trial court did not err.

## I. **Factual and Procedural Background**

The Record tends to show the following facts: On 19 April 2012, J.S.[1] was born to Octavia Bennet-Smith ("Ms. Smith") and Jamarkus Smith ("Defendant"). In May 2014, Ms. Smith, a then-active-duty member of the military, was deployed overseas for nine months, leaving J.S. in the exclusive care of Defendant. Prior to Ms. Smith's deployment, J.S. was a perfectly healthy, chubby baby who would eat any food put in front of her, but upon Ms. Smith's return from deployment on 15 February 2015, she discovered that J.S. was "really tiny, skinny, skinny." Ms. Smith also found J.S. would only eat when encouraged, but she would do so in a very "slow" manner and almost never when she was around Defendant. Neither Defendant nor Ms. Smith took J.S. to the doctor, despite her diminishing physical state.

In the months following Ms. Smith's return from deployment, J.S.'s physical state continued to diminish, and she showed little sign of an appetite except when encouraged to eat by her mother; even then, she ate slowly. Ms. Smith bought several weight-gain supplements for J.S. in an effort to help her reach a healthy weight. While Ms. Smith was at work, Defendant would tell her that he sat with J.S. while she ate, but J.S. still showed no sign of gaining any weight.

In the summer of 2015, J.S. went on a family vacation for a week with Ms. Smith's sister. Ms. Smith and Defendant did not attend the family vacation. When J.S. returned from the trip, Ms. Smith observed that she was "happier" and "had more

---

[1] A pseudonym is used in accordance with N.C. R. App. P. 42(b)(3).

of an appetite" after her time away from Defendant.  Upon return home, however, J.S.'s health began to decline once again.  Despite encouragement from Ms. Smith, J.S. rarely ate.  When J.S. refused to eat, Defendant regularly resorted to violent disciplinary measures, such as beating J.S. with his belt or hands.  In some instances, Defendant would force J.S. to perform pushups, run sprints, and climb up and down a high chair as punishment for her lack of appetite.

By September 2015, J.S. had lost what weight and energy she had gained on vacation, and was "smaller . . . more withdrawn[,] and . . . just not the same."  J.S. was "playful," "chatty," and "talkative" when around Ms. Smith, but would become closed off when Defendant was nearby.  Defendant told Ms. Smith he believed this was because J.S. saw him as the "disciplinarian," while Ms. Smith was the "playful" parent.  By November 2015, J.S. was even smaller, and, while she was playful with Ms. Smith, J.S. would not "interact" with Defendant.  Defendant would also only willingly engage with J.S. when asked to by Ms. Smith such as when she was "sleepy" after work and would ask Defendant to "take" J.S.  By this time, J.S. was also observed as having less control over her bladder and bowels; Ms. Smith noted that J.S. would no longer tell anyone she had to "go potty" and would soil herself wherever she was sitting.  Defendant would spank J.S. as punishment for these accidents.

*30 November 2015*

On 30 November 2015, Ms. Smith returned home from work to find J.S. in a chair watching television with Defendant.  When Ms. Smith greeted J.S., J.S. got up

and slowly moved towards Ms. Smith. Defendant, seeking to discipline J.S. for her slow movement, "grabbed [J.S.] by her arm . . . and . . . popped [J.S.] on the behind" with his belt. The force of Defendant's blow caused J.S. to pitch and fall forwards, but since Defendant was holding her wrist, J.S. could not extend her arm to prevent her fall. She fell and hit her face into the floor, prompting a nosebleed.

Later that night, while the family was eating dinner together, J.S. hardly ate and complained of being thirsty. Ms. Smith proceeded to fill a "coke bottle" with water for J.S. Defendant, however, objected, claiming that he and Ms. Smith should not reward J.S. for being disobedient by not eating. Defendant proceeded to beat J.S. with his belt to discipline her.

The next morning, Ms. Smith went to work where she received texts from Defendant asking her why J.S. was "walking funny." Defendant later called Ms. Smith, exclaiming that "something's wrong with [J.S.][;] I think she's dying." Ms. Smith immediately left work and arrived home to find J.S. unconscious and naked from the waist down while Defendant frantically splashed water onto her face in an effort to revive her. As the two attempted to resuscitate J.S., Ms. Smith also noticed a bruise on J.S.'s inner thigh. Ms. Smith questioned Defendant about it who, when pressed, yelled "I got to get to South Carolina, my mama going to protect me." Upon entering the ambulance, Ms. Smith asked the emergency technician to "perform a kit . . . a sexual assault kit on [J.S.]."

*Admittance to the Hospital and Death*

J.S. was admitted to the hospital with a body temperature of merely 88 degrees; generally, a healthy body temperature for a child of J.S.'s age is 97.4 degrees. J.S.'s emergency care team observed that since J.S.'s body had "no muscle mass [and] no subcutaneous fat," it was virtually impossible for her to retain body heat. J.S.'s body mass index "was around 12" meaning she was "so profoundly underweight that it was not surprising that she might not survive." As J.S.'s care team struggled to save her life and bring her core temperature up, they noticed a series of injuries that seemed indicative of a pattern of "physical and sexual" abuse. This included "large chronic and acute tearing of [J.S.'s] anus," with visualization of the intestines and active bleeding, and "extensive bruising" on her "labia and . . . inner thighs." Further, J.S.'s hips appeared to be "chronically forced outward" such that the emergency personnel "could not get them to go straight." J.S. had contusions across her entire body and hemorrhaging under the skin on her limbs and torso, as well as a periosteal hemorrhage in the skull.

Ultimately, J.S. was pronounced dead at 11:11 a.m. on 1 December 2015. Her cause of death was reported as "acute and organizing bilateral bronchopneumonia in the setting of malnutrition, neglect and sexual abuse." J.S.'s autopsy did not reveal any bacteria or pathogen that could have caused pneumonia. Instead, the attending physician identified atelectasis—the inability to properly breathe deeply—as the cause of the pneumonia. Atelectasis may develop in malnourished children because their bodies become "so weak" that they cannot properly draw breath.

*Trial and Expert Testimony*

The Fayetteville Police Department arrested Defendant on 1 December 2015 based on their belief that he had committed assault resulting in serious physical injury on a minor; committed a "lewd and lascivious act" upon J.S., a minor; and "killed J.S. with malice aforethought." A Cumberland County Grand Jury indicted Defendant on 13 March 2017 for first-degree murder, felony child abuse inflicting serious physical injury, felonious child abuse-sexual act upon a child, taking indecent liberties with a child, and two counts of sexual offenses against a child by an adult.

At trial, Dr. Timothy Hartzog ("Dr. Hartzog"), the emergency physician who led J.S.'s care team, provided testimony regarding his observations of J.S.'s injuries and condition while she was in the hospital. He first noted that, upon her admission to the hospital, J.S. looked "extremely ill, had the markings of a child that was extremely malnourished, [and] ha[d] been subjected to abuse, physical[] and sexual." Dr. Hartzog considered J.S.'s lack of muscle mass and subcutaneous fat as indicative of a pattern of "malnutrition," and explained that her body lacked the ability to retain heat as a result. Dr. Hartzog stated that, in his expert opinion, the active bleeding on J.S.'s anus at the time of her admission evidenced some sort of traumatic event that happened mere "hours before [the] visit." He further testified that J.S.'s inability to lie with her legs straight was most likely the result of something that "chronically forced [J.S.'s] hips apart and wide to get access to her perineum."

The State elicited testimony from two more experts: Dr. Kimberly Janssen ("Dr. Janssen"), the deputy chief medical examiner who performed J.S.'s autopsy, and Dr. Sharon Cooper ("Dr. Cooper"), a developmental and forensic pediatrician who offered expert testimony on fatal child maltreatment and sexual abuse. Though both witnesses testified regarding the nature of J.S.'s death, neither of them had pretrial access to the investigative reports; they had access only to the autopsy report. Defendant did not object to the testimony of either of these expert witnesses at trial.

During her testimony, Dr. Janssen testified extensively about the autopsy she performed, before summarizing her findings and concluding that J.S.'s cause of death was "acute and organizing bronchopneumonia," and that "malnutrition contribute[d] to the death" because a healthy child could have fought off a pneumonia infection. She further stated that "the abuse [and] neglect in this case raises [] the manner to the level of homicide."

Dr. Cooper testified that when a child is "emaciated and malnourished" in the way that J.S. appeared, their mistreatment must be the product of "more than neglect," and that the mistreatment must have been a "willful" act. Dr. Cooper testified at length about the nature of the injuries indicated in the evidence: J.S.'s head and hands were disproportionate to the rest of her body; J.S.'s contusions and cuts did not seem consistent injuries typical of a fall; J.S.'s body was covered in contusions consistent with chronic and severe blunt force trauma; and J.S. had bruising all over her genitalia. Dr. Cooper stated that, in some of the worst situations,

children may begin to starve in response to psychological trauma from abuse. Finally, Dr. Cooper echoed Dr. Janssen's findings and, based on her examination of the medical evidence, identified starvation and malnutrition as J.S.'s cause of death. On cross-examination, Dr. Cooper admitted she had access only to the medical records and autopsy report, and she had not been provided information about Defendant and Ms. Smith's efforts to get J.S. to gain weight.

At the close of the State's evidence, Defendant moved to dismiss the charge of first-degree murder by torture, alleging that the State's evidence did not adequately show "Defendant had . . . intentionally withheld food or hydration sufficient to cause death," meaning that Defendant could not have proximately caused J.S.'s death. The trial court denied Defendant's motion, and a jury subsequently found Defendant guilty of felonious child abuse inflicting a physical injury, felonious child abuse by committing a sexual act, indecent liberties with a child, two counts of statutory rape, and first-degree murder on the basis of torture. Defendant was sentenced to life in prison without parole for the conviction of first-degree murder and to an additional prison sentence of 300 to 420 months at the expiration of his life-sentence for the sexual offenses.

Defendant timely appealed from the trial court's rejection of his motion to dismiss the first-degree murder charge.

## II. Jurisdiction

An appeal lies of right directly to this court from any final judgment of a superior court. N.C. Gen. Stat. § 7A-27(b)(1) (2021).

## III. Analysis

On appeal, Defendant argues the trial court erred by (1) denying his motion to dismiss, alleging the State's evidence did not sufficiently indicate that Defendant's conduct was the proximate cause of J.S.'s death, and (2) impermissibly allowing testimony from the State's expert witnesses. For the reasons stated below, we disagree and conclude there was no error.

### A. Defendant's Motion to Dismiss

#### 1. Standard of Review

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "Under a *de novo* review, the [C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (citations and internal quotation marks omitted).

#### 2. Substantial evidence regarding Defendant's torture of J.S.

In reviewing Defendant's motion to dismiss the charge of first-degree murder by torture, we begin by examining whether Defendant's conduct was torture. We hold that it was.

"Upon [a] defendant's motion for dismissal, the question for the Court is whether there is substantial evidence of (1) each essential element of the offense

charged . . . and (2) of [the] defendant's being the perpetrator of such an offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (quoting *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980).

"First-degree murder by torture requires the State to prove that the accused intentionally tortured the victim and that such torture was a proximate cause of the victim's death." *State v. Pierce,* 346 N.C. 471, 492, 488 S.E.2d 576, 588 (1997) (citation and internal quotation marks omitted). Our Supreme Court defines torture as "the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure." *State v. Anderson*, 346 N.C. 158, 161, 484 S.E.2d 543, 545 (1997) (citation omitted). Said course of conduct is "the pattern of the same or similar acts, repeated over a period of time, however short, which establish[es] that there existed in the mind of the defendant a plan, scheme, system, or design to inflict cruel suffering upon another." *Id.* at 161, 484 S.E.2d at 545. "The presence or absence of premeditation, deliberation, and specific intent to kill is irrelevant in determining whether the evidence is sufficient for first-degree murder by torture." *State v. Lee*, 348 N.C. 474, 489, 501 S.E.2d 334, 344 (1998) (citation and internal quotation marks omitted).

- 10 -

Here, several facts were presented that "a reasonable mind might accept as adequate to support" the conclusion that Defendant tortured J.S. *See Smith*, 300 N.C. at 78, 265 S.E.2d at 169. For example, the Record demonstrates that, at some point after Ms. Smith deployed, J.S., while in the sole care of Defendant, lost her appetite and a significant amount of weight. Upon Ms. Smith's return, J.S. would eat slowly, but only if Ms. Smith was feeding her and hardly ever in the presence of Defendant. By this time, Defendant had begun to beat J.S. with his hands and belt, seemingly under the pretense of disciplining her for various infractions, including her lack of appetite. As punishment, Defendant forced her to exercise and would withhold water if she didn't eat. The Record further indicates that, beyond a violent and physical approach to discipline, Defendant was sexually assaulting J.S. It is probable that, combined, such psychological trauma resulting from the abuse contributed to J.S.'s malnutrition. By the time J.S. was admitted to the hospital, she had no subcutaneous fat and was profoundly underweight. Her hips had been so chronically forced outwards that they would not lie straight, she had bruising around her genitalia, and a build-up of scar tissue and acute tearing in and around her anus. At the time she was admitted to the hospital, J.S. was also actively bleeding from her anus, which medical experts believed was indicative of penetrative trauma that had happened at most, hours before.

There is no doubt Defendant's cruel and depraved conduct constituted torture. Beating J.S. with a belt, forcing her to exercise, withholding water, and sexually

assaulting her is clearly "a course of conduct . . . which intentionally inflict[ed] grievous pain and suffering upon [J.S.]," and it was seemingly done "for the purpose of punishment." *See Anderson*, 346 N.C. at 161, 484 S.E.2d at 545. Far from isolated incidents, Defendant's acts can accurately be described as a "course of conduct." *Id.* at 161, 484 S.E.2d at 545. There is clearly a "pattern of the same or similar acts, repeated over a period of time," as the evidence tends to show that Defendant regularly and commonly resorted to beating J.S., forcing her to exercise, and withholding water, and expert medical testimony at trial tends to show that the sexual abuse was chronically occurring. *See id.* at 161, 484 S.E.2d at 545. Accordingly, we hold that the State satisfied its evidentiary burden to show that Defendant's actions constituted torture. *See Lee*, 348 N.C. at 489, 501 S.E.2d at 343–44.

### 3. Proximate Cause

Defendant contends that, even if his violent physical and sexual abuse of J.S. constituted torture, it was not the proximate cause of J.S.'s death. To support this, Defendant argues J.S. actually died of pneumonia aggravated by her state of starvation. According to Defendant, the pneumonia and starvation were "new and independent cause[s]" that were not the "result of any of [Defendant's] acts." We disagree.

The doctrine of proximate causation exists across the law as a limiting factor, designed to prevent liability from reaching too far back along a causal chain and

applying to parties who cannot truly be said to be responsible for a harm done. *See e.g. Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L. Ed. 2d 532 (1992) ("Here we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."); *see also* W. Page Keeton et al., *Prosser and Keeton on Torts* § 41, at 264 (5th ed. 1984) ("Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.").

A proximate cause is one in,

> (1) which, in a natural and continuous sequence and unbroken by any new and independent cause, produces an injury; (2) without which the injury would not have occurred; and (3) from which a person of ordinary prudence could have reasonably foreseen that such a result, or some similar injurious result, was probable under the facts as they existed.

*State v. Hall*, 60 N.C. App. 450, 454–55, 299 S.E.2d 680, 683 (1983). For the purposes of proximate causation, "the act of the accused need not be the immediate cause of the death[;] [the accused] is legally accountable if the direct cause is the natural result of his criminal act." *State v. Minton*, 243 N.C. 716, 722, 68 S.E.2d 844, 848 (1952).

First, Defendant's contention that there is no causal chain connecting his torturing J.S. to her starvation and pneumonia is unsupported by the evidence. The Record indicates J.S. did not lose her appetite or struggle with eating until she was left in Defendant's sole custody for nine months. The Record further shows that when she was only around Ms. Smith, J.S. would eat, albeit slowly and with plenty of

encouragement. The facts in the Record reveal that in the summer of 2015, J.S. went on a family trip without Defendant and returned happier, more energetic, and with more of an appetite. To that end, J.S. also behaved differently when away from Defendant: she was more energetic and talkative. Finally, J.S.'s pneumonia infection was not an independent cause; expert testimony indicated that atelectasis—the inability to properly breathe deeply—both caused and limited J.S.'s ability to fight off her pneumonia.

Contrary to Defendant's assertion, J.S.'s starvation was not an independent cause sufficient to break the causal chain between Defendant's torturous abuse of J.S. and her heartbreaking death. Instead, the evidence demonstrates that J.S.'s loss of appetite and subsequent starvation were the product of Defendant violently physically and sexually abusing her. The Record evidence and trial testimony illustrate a toddler who lost her appetite as a result of the psychological trauma she suffered from Defendant's abuse.

Medical evidence indicates that Defendant sexually abused J.S. for an extended period of time and that J.S. did not lose her appetite until she was left in the exclusive care of Defendant. The evidence also tends to show that J.S.'s starvation caused her pneumonia. J.S. did not develop pneumonia from some chance encounter with a pathogen. Instead, J.S. contracted pneumonia because her body was too weak to properly draw breath as a result of her state of deathly malnourishment.

Far from being unfortunate and independent causes, J.S.'s starvation and pneumonia are the "natural result" of Defendant's "criminal act[s]" of violently and sexually abusing J.S. *See Minton*, 243 N.C. at 722, 68 S.E.2d at 848. Accordingly, there was no break in the causal chain.

Second, Defendant characterizes his treatment of J.S. as little more than "non-fatal assaults," which he could not have "reasonably foreseen" would result in J.S.'s death. Defendant's argument that J.S.'s death was not reasonably foreseeable is unsupported by the evidence or law.

We begin by noting that our inquiry is not whether Defendant could have reasonably foreseen the death, but whether a "person of ordinary prudence could have reasonably foreseen that such a result, or some similar injurious result, was probable under the facts as they existed." *Hall*, 60 N.C. App. at 455, 299 S.E.2d at 683.

Here, there was a relationship between Defendant's abusive acts and J.S.'s starvation and exceedingly diminished physical state. Defendant chronically physically and sexually abused J.S., his daughter, to the point that she lost her appetite and would not eat. Her loss of appetite led to J.S. becoming dangerously malnourished and starved, a condition that subsequently led to J.S. contracting pneumonia, and ultimately dying.

A "person of ordinary prudence" would have reasonably foreseen that continuing to perpetuate a cycle of physical and sexual abuse that already seemed to be causing the victim to starve would produce an injurious result, if not death. *See*

*id.* at 455, 299 S.E.2d at 683. J.S.'s death was the "probable" result of Defendant's abuse. *See id.* at 455, 299 S.E.2d at 683. Accordingly, we hold that J.S.'s death was foreseeable "under the facts as they existed." *See id.* at 455, 299 S.E.2d at 683.

Because J.S.'s death was the "natural result" of Defendant's "criminal act[s]" (*see Minton*, 243 N.C. at 722, 68 S.E.2d at 848), and a "person of ordinary prudence" would conclude that J.S.'s death was the "probable" result of her abuse (*see Hall*, 60 N.C. App. at 455, 299 S.E.2d at 683), J.S.'s death completed the causal chain that began with her abuse and torture at the hands of Defendant. Defendant is, therefore, properly responsible for the harm done, and, thus, we hold there was no error in the trial court's denial of Defendant's motion to dismiss. *See Williams*, 362 N.C. at 632–33, 669 S.E.2d at 319.

## B. The State's Expert Testimony

"[T]he trial judge is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony." *State v. Bullard*, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984). Normally, "the trial court's decision regarding what expert testimony to admit will be reversed only for an abuse of discretion." *State v. Alderson*, 173 N.C. App. 344, 350, 618 S.E.2d 844, 848 (2005). "In criminal cases, an issue that was not preserved by objection noted at trial . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4); *see also State v. Goss*, 361 N.C. 610, 622, 651 S.E.2d 867, 875

(2007). Plain error arises when an error is "so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]" *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citations and internal quotation marks omitted).

"In order to preserve a question for appellate review, a party must have presented the trial court with a timely request, objection or motion, stating the specific grounds for the ruling sought if the specific grounds are not apparent." *State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991); *see also* N.C.R. App. P. 10(a)(1). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan,* 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

Under the North Carolina Rules of Evidence, an expert witness may testify if: "(1) [t]he testimony is based upon sufficient facts or data[,] (2) [t]he testimony is the product of reliable principles and methods[, and] (3) [t]he witness has applied the principles and methods reliably to the facts of the case." N.C. R. Evid. 702. "Testimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C. R. Evid. 704.

Defendant challenges Dr. Janssen's testimony that the level of "neglect" in J.S.'s death "raises [] the manner to the level of homicide." Defendant, however, did not object or file a motion *In Limine* following Dr. Janssen's testimony. Defendant likewise challenges Dr. Cooper's testimony that the mistreatment of J.S. must have been a "willful" act, but similarly failed to object at the time of the testimony.

Accordingly, Defendant did not preserve the admission of the expert testimony under Rule 702 as an issue for appellate review. *See* N.C. R. App. P. 10(a)(1). We, therefore, review the admission of the testimony for plain error and, for the reasons explored below, do not find any.

Under the plain error rule, there must first have been error committed. *Jordan,* 333 N.C. at 440, 426 S.E.2d at 697. We see no evidence in the Record that this testimony was not "based upon sufficient facts or data," or that it was not "the product of reliable principles and methods." *See* N.C. R. Evid. 702. Dr. Janssen and Dr. Cooper each testified as to their beliefs and opinions about J.S.'s death. Though they both made comments that related to Defendant's state of mind, their comments were sufficiently based on the facts and evidence before them.

If error was committed, however, then under the plain error rule this Court considers whether "absent the error, the jury probably would have reached a different result." *Jordan,* 333 N.C. at 440, 426 S.E.2d at 697. In this case, the jury probably would have reached the same verdict even without the challenged testimony. Dr. Janssen and Dr. Cooper merely testified that, based on the evidence before them, J.S.'s starvation and death did not appear consistent with a death solely caused by neglect. There is no evidence that the jury misunderstood the testimony and instead thought that the two experts were testifying as to Defendant's actual mental state. As we have previously explained, it does not matter whether Defendant intentionally

starved J.S., as the starvation was clearly the product of Defendant's intentional abuse and was obviously made worse by Defendant's continued actions.

Accordingly, even if the trial court had excluded Dr. Janssen and Dr. Cooper's testimony, the jury probably would have reached the same result given the sheer weight of the evidence. As such, we affirm the trial court's order. *See Odom*, 307 N.C. at 660, 300 S.E.2d at 378.

## V. **Conclusion**

After careful review, we conclude: the trial court did not err when it denied Defendant's motion to dismiss, as the State's evidence amply supported proximate causation of the child's death, and the trial court properly admitted the testimony of expert witnesses. For the foregoing reasons, we affirm the trial court's rulings and the jury verdict.

NO ERROR.

Judges HAMPSON and RIGGS concur.