IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-305

No. COA20-499

Filed 6 July 2021

Watauga County, Nos. 17 CRS 50616-17

STATE OF NORTH CAROLINA

v.

ISAIAH SCOTT BECK

Appeal by defendant from judgments entered 31 October 2019 by Judge Susan E. Bray in Watauga County Superior Court. Heard in the Court of Appeals 9 June 2021.

*Joshua H. Stein, Attorney General, by Assistant Attorney General Wes Saunders, for the State.*

*Dylan J.C. Buffum Attorney at Law, PLLC, by Dylan J.C. Buffum, for defendant.*

ARROWOOD, Judge.

¶ 1     Isaiah Scott Beck ("defendant") appeals from judgments entered 31 October 2019 for convictions of robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, felonious breaking and entering, and conspiracy to commit felonious breaking and entering. For the following reasons, we

- 1 -

vacate the conspiracy conviction in Case No. 17 CRS 50616. Apart from this disposition, we conclude that defendant received a fair trial free of prejudicial error.

## I. Background

At all relative times, Mackenzie Beshears ("Beshears") lived with her boyfriend, Devon Trivette ("Trivette"), and a roommate Daniel Blackburn ("Blackburn") in Boone, North Carolina. Beshears, who at the time was a student at Appalachian State University, sold narcotics on the side, particularly Xanax and marijuana.

On 27 April 2017, Beshears was contacted by a former high school associate Cameron Baker ("Baker") who inquired whether Beshears had any drugs for sale. Given their prior affiliation, Beshears agreed to the sale and arranged to consummate the transaction at Beshears' apartment.

After working out logistics, Baker advised Beshears that his friend Danny Silva ("Silva") would arrive by himself and complete the purchase. Silva pulled into the subject apartment complex but was spooked after noticing that Beshears and Trivette were watching him from an apartment window. Beshears then called Baker who told her that Silva was returning to the apartment complex. Silva arrived at Beshears' apartment and was greeted and admitted by Beshears and Trivette. Beshears noticed that Silva was "really sweaty and acting bizarre."

¶ 5 Trivette then left the room to take a shower while Silva and Beshears finalized the transaction. At this moment, two men suddenly burst into the apartment wearing all black and bandannas covering the lower portions of their faces. Notwithstanding their disguises, Beshears immediately recognized the two men as defendant and Javier Holloway ("Holloway"). Beshears had previously met defendant and had viewed photos of Holloway on Baker's social-media platform.

¶ 6 Upon entry, defendant raised an AR-15 assault rifle to Beshears' head and instructed Holloway to grab everything he could. When Holloway attempted to steal Beshears' bookbag, Beshears began screaming for Trivette and a physical altercation ensued. Trivette proceeded to physically engage defendant and pushed him toward the door of the apartment. Holloway then charged at Trivette; at this point, Blackburn emerged from his room and came to the aid of Beshears and Trivette. As the three occupants attempted to force defendant and Holloway out of the apartment door, defendant wedged the barrel of his gun between the door to prevent it from closing. Ultimately, Blackburn, Trivette, and Beshears were able to oust defendant and Holloway and latch the door. While outside, defendant began shouting and threatened to shoot into the apartment. Silva was still inside the apartment, standing alone in the corner. Silva denied any involvement in the robbery or knowing the intruders, and claimed that he was there only to buy drugs.

¶ 7        Over Trivette's objections, Blackburn called the police. As police sirens were approaching, Trivette let Silva leave the apartment, though Silva was swiftly apprehended as he fled the scene by Lieutenant Daniel Duckworth ("Lt. Duckworth") and Officer Kaleb Forrest ("Officer Forrest"). Detective Kat Eller ("Detective Eller") then arrived at the scene and interviewed Beshears, Trivette, and Blackburn. The occupants identified defendant and Holloway as the assailants, prompting the Boone Police Department to issue a "be on the lookout" alert to local enforcement agencies.

¶ 8        During Detective Eller's initial interview with Beshears, Beshears falsely claimed that she had arranged to *purchase*, not sell, controlled substances from Silva and his associates. Shortly thereafter, Detective Eller was informed that Silva had been apprehended and that text messages from his phone indicated that Beshears was the seller, not the purchaser, of the drugs. In order to develop trust and ensure that she had received accurate information, Detective Eller allowed Beshears to destroy evidence of other narcotics in the apartment by flushing marijuana, pills, and crushed Xanax down the toilet. Beshears then turned over her cellular phone to Detective Eller and consented to the search of its contents. Detective Eller then spoke to Trivette, who admitted that Beshears was selling drugs and that the buyers "were coming here to get [drugs] and I guess it just went bad." Neither Beshears nor Trivette were charged in connection with respect to the incidents noted above.

¶ 9        After taking Silva into custody, Lt. Duckworth proceeded to the scene of the crimes. Lt. Duckworth, in addition to his duties with the Boone Police Department, had been previously assigned to a special task force through the Department of Homeland Security focusing on drug smuggling. Two months earlier, Lt. Duckworth received a tip from a confidential informant that a group of individuals from out of town were planning to rob Boone-area drug dealers. Lt. Duckworth and Detective James Lyall ("Detective Lyall") set up surveillance around the area in which they believed the conspirators were located. Detective Lyall had photographs of the suspects from their respective Facebook accounts. After driving past the subject location, Lt. Duckworth observed two suspects matching the photo descriptions. Lt. Duckworth immediately set up a perimeter, per protocol, when an unidentified person approached Lt. Duckworth's vehicle and reported seeing two males run through his yard in the direction of downtown Boone (both of whom matched the descriptions of the suspects identified by Detective Lyall).

¶ 10        Around the same time, a student at Appalachian State University, Ashley Hickman ("Hickman"), was riding a bus from campus when two men abruptly boarded the bus at an intersection. She testified that the two men appeared sweaty, unsettled, and agitated. While on the bus, Hickman received an alert on her cell phone informing her of the criminal activity discussed above and describing the suspects. Shortly after, the two suspects exited the bus and fled across Highway 105.

Hickman called the police and reported these events and exited the bus at the same location as the suspects and proceeded to her apartment complex which was located behind the "Water Wheel Café."

¶ 11        Meanwhile, Baker was at his apartment, located just a few hundred yards from the Water Wheel Café. He received a phone call from defendant advising him that the drug deal had gone wrong and asking him for transportation. Later, defendant and Holloway arrived at Baker's apartment and obtained new clothing. Hickman, shortly thereafter, walked outside of her apartment and observed the same two men from the bus in her apartment complex parking lot, though they were wearing different clothes. She watched the two men proceed to a structural water wheel in front of the Water Wheel Café and hide from view. Hickman immediately contacted law enforcement and updated them on the location of the two suspects.

¶ 12        Lt. Duckworth proceeded to the Water Wheel Café to set up surveillance. From this vantage point, Lt. Duckworth observed defendant and Holloway near the Water Wheel Café but noted that they had changed their clothing. After observing the suspects for a few minutes, a marked police cruiser passed the location of the suspects and they fled on foot into the woods, prompting other officers to respond. Detective Lyall, who was then riding with another officer, pursued the suspects and apprehended defendant after a short chase. Holloway was taken into custody shortly thereafter by Lt. Duckworth.

¶ 13        Once in custody, a warrant was issued to search the contents of Silva's seized cell phone. Law enforcement extracted a series of text messages between Silva and Holloway. These messages revealed that on 18 April 2017, Silva sent Holloway a text asking for "a pic with [Silva] and the gun lol so I can show my amigo." Holloway sent a video file back to Silva with a picture of Silva and a gun. On the same day, Holloway sent Silva another message stating, "[Hit me up] . . . asap got a lick."[1] Another message dated 24 April 2017 revealed a text from Holloway to Silva stating, "Aye bro I need that [rifle] asap." Then, on the evening of 26 April 2017, Holloway again messaged Silva and asked whether he was "try[ing] [to get in] on this lick in the am." Silva replied, "Where[?]" Holloway responded, "Boone, certified we gone [sic] come up bro we just need a ride." Silva then said, "Ight [sic] you me and [defendant]?" Holloway confirmed by saying, "Yeah." On 27 April 2017, defendant messaged Baker asking if he knew "where he could buy some drugs and stuff, and [Baker] told him [that he] knew someone that [he] could put [defendant] in contact with." Baker was then informed by defendant, Silva, and Holloway that they were currently driving to Boone in Silva's car. Baker reached out to Beshears to make the introduction and set the trap for the robbery. Defendant sent another message to Baker while en route to Boone stating that "Ima [sic] take all the money [Beshears] got too I might can have

---

[1] Detective Jason Reid testified that, based on his training and experience, a "lick" refers to a "robbery."

her take me to [Trivette's] money." According to Baker, he interpreted this message to mean that defendant intended to "take [Beshears'] belongings and try to get her to take him to the stuff that [Trivette] had as well." The messages exchanged above clearly demonstrate that Silva, Holloway, and defendant intended to rob Beshears and Trivette on 27 April 2017—though defendant was not included in the messages between Silva and Holloway in the preceding days. As mentioned above, the criminal plan was executed on 27 April 2017.

¶ 14        On 5 September 2017, defendant was indicted for robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, felonious breaking and entering, and conspiracy to commit felonious breaking and entering. Following a four-day trial, the jury returned verdicts finding defendant guilty of all charges. The trial judge consolidated the robbery and conspiracy to commit robbery charges into one judgment, and sentenced defendant to a minimum of 73 months' and a maximum of 100 months' imprisonment (within the presumptive range for a prior record level two offender). The trial court also consolidated the breaking and entering and conspiracy to commit breaking and entering charges into one judgment, and imposed an active sentence of 8 to 19 months' incarceration to run consecutive to the first sentence (within the presumptive range for a prior record level two offender). Judgments were entered on 31 October 2019.

¶ 15    Defendant filed a timely notice of appeal on 1 November 2019. Defendant's appeal is properly before this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444.

## II.    Discussion

¶ 16    Defendant argues that the trial court erred by denying his motion to dismiss one of the two conspiracy charges and by entering two judgments for the same. Defendant also claims that the trial court committed prejudicial error by failing to provide the jury with a transcript of Blackburn's trial testimony following the jury's request for this record. We address each issue in turn.

## A.    Conspiracy

¶ 17    Defendant argues that the trial court erred by denying his motion to dismiss one of the two conspiracy charges and entering two separate judgments for the convictions. We agree.

¶ 18    "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citing *State v. McKinnon*, 306 N.C. 288, 298, 293 S.E.2d 118, 125 (1982)). In ruling on a motion to dismiss, "the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Winkler*, 368 N.C. 572, 574, 780 S.E.2d 824, 826 (2015) (internal quotation marks and citations omitted). Substantial evidence has been defined by our North Carolina

Supreme Court as "evidence which a reasonable mind could accept as adequate to support a conclusion." *State v. Lee,* 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998) (citing *State v. Vick,* 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995)). In reviewing the trial court's decision on appeal, the evidence must be viewed "in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993) (citation omitted).

¶ 19 In order to be submitted to the jury for determination of defendant's guilt, the evidence "need only give rise to a reasonable inference of guilt." *State v. Turnage*, 362 N.C. 491, 494, 666 S.E.2d 753, 755 (2008) (citing *State v. Stone,* 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988)).

¶ 20 This is true regardless of whether the evidence is direct or circumstantial. *State v. Trull,* 349 N.C. 428, 447, 509 S.E.2d 178, 191 (1998). If the court decides that a reasonable inference of the defendant's guilt may be drawn from the circumstances, then "it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (citation and emphasis omitted). When ruling on a motion to dismiss, the only question for the trial court is whether "the evidence is sufficient to get the case to the jury; it should not be concerned with the weight of the evidence." *State v. Earnhardt*, 307 N.C. 62, 67, 296

S.E.2d 649, 652 (1982) (citing *State v. McNeil*, 280 N.C. 159, 162, 185 S.E.2d 156, 157 (1971)).

¶ 21    "A criminal conspiracy is an agreement by two or more persons to perform an unlawful act or to perform a lawful act in an unlawful manner." *State v. Rozier*, 69 N.C. App. 38, 49, 316 S.E.2d 893, 900 (1984) (citation omitted). The crime of criminal conspiracy is complete once an agreement is reached; the conspirators need not take any overt act to establish criminal liability. *Id.* "It is also clear that where a series of agreements or acts constitutes a *single* conspiracy, a defendant cannot be subjected to multiple indictments consistently with the constitutional guarantee against double jeopardy." *Id.* at 52, 316 S.E.2d at 902 (emphasis in original) (citation omitted). "[W]hen the State elects to charge separate conspiracies, it must prove not only the existence of at least two agreements but also that they were separate." *State v. Griffin*, 112 N.C. App. 838, 840, 437 S.E.2d 390, 392 (1993) (citation omitted). Our Supreme Court has enumerated a number of factors to consider in deciding whether multiple agreements constitute a single conspiracy or multiple conspiracies, which include, but are not limited to, the "nature of the agreement or agreements, the objectives of the conspiracies, the time interval between them, the number of participants, and the number of meetings are all factors that may be considered." *State v. Tirado*, 358 N.C. 551, 577, 599 S.E.2d 515, 533 (2004) (citation omitted).

¶ 22           Here, we conclude that the trial court erred by denying defendant's motion to dismiss the charge of conspiracy to commit robbery with a dangerous weapon. The State's evidence established *one* single conspiracy that continued from on or around 18 April 2017 through the date of the breaking and entering and armed robbery on 27 April 2017. The decision to break and enter into Beshears' apartment did not convert the original conspiracy to rob a drug dealer in Boone into two separate conspiracies. *See Rozier*, 69 N.C. App. at 52, 316 S.E.2d at 902 (citation omitted) ("[U]nder North Carolina law[,] multiple overt acts arising from a single agreement do not permit prosecutions for multiple conspiracies."). The evidence at trial established the existence of one agreement and only one conspiracy, insofar as defendant is concerned: to break and enter into Beshears' apartment and rob Beshears and Trivette of their drugs, money, and other belongings. The agreement between defendant, Silva, and Holloway was entered on or around 26-27 April 2017 with one objective in mind. Although the robbery conspiracy evolved into a breaking and entering plot and the details regarding the target and location of the robbery were not finalized until hours before the crime, the criminal purpose remained the same. Since the State elected to charge defendant with separate conspiracies, it had to "prove not only the existence of at least two agreements but also that they were separate." *Id.* at 53, 316 S.E.2d at 902 (citation omitted). The State failed to connect defendant with Silva and Holloway's initial text conversation regarding robbing a

drug dealer in Boone. Moreover, we disagree with the State's contention that when Silva declined Beshears' offer to conduct a drug sale in the parking lot, defendant and Silva hatched a new, separate agreement to break and enter into Beshears' apartment. "A single conspiracy is not transformed into multiple conspiracies simply because its members vary occasionally and the same acts in furtherance of it occur over a period of time." *Griffin*, 112 N.C. App. at 841, 437 S.E.2d at 392 (citation omitted). In our view, the events in this case were so overlapped as to comprise one continuing conspiracy.

¶ 23        We cannot allow two conspiracy convictions to stand when the State produced evidence of only one agreement between defendant and his co-conspirators. *See State v. Hicks*, 86 N.C. App. 36, 42, 356 S.E.2d 595, 598 (1987); *see also State v. Fink*, 92 N.C. App. 523, 533, 375 S.E.2d 303, 309 (1989).

¶ 24        When the Court vacates one of multiple conspiracy convictions, we must identify the first substantive crime committed in determining which conspiracy charge to vacate. *See Fink*, 92 N.C. App. at 533, 375 S.E.2d at 309 (citations omitted); *cf. State v. Tabron*, 147 N.C. App. 303, 307-308, 556 S.E.2d 584, 587 (2001) (holding that only the "earliest conspiracy conviction should stand."). Here, the felony breaking and entering was the first substantive crime as it occurred before (albeit immediately before) the armed robbery. As the felony breaking and entering was the first substantive crime committed by defendant (*i.e.*, the "operative" crime), because

the conspiracy to commit felony breaking and entering was the "earlier of the conspiracy convictions" insofar as defendant is concerned, and because the State failed to prove that defendant conspired with Holloway and Silva in the weeks leading up to the crimes, we vacate defendant's conviction for conspiracy to commit armed robbery in Case No. 17 CRS 50616. *See Hicks*, 86 N.C. App. at 42, 356 S.E.2d at 598; *see also Fink*, 92 N.C. App. at 533, 375 S.E.2d at 309.

¶ 25        Because the trial judge consolidated the conspiracy to commit armed robbery conviction with the substantive robbery conviction and sentenced defendant within the presumptive range for the latter offense, defendant has not shown a reasonable probability that the trial court would have imposed a different and perhaps lesser sentence for the substantive offense of robbery with a dangerous weapon had the robbery conspiracy charge been dismissed. *See Rozier*, 69 N.C. App. at 54, 316 S.E.2d at 903.

## B.        Trial Transcript

¶ 26        Defendant contends that the trial court abused its discretion by failing to provide the jury with a copy of Blackburn's trial testimony after the jury requested this record from the court. We disagree.

¶ 27        During deliberations, the jury submitted a note to the trial judge asking whether it could review a record or copy of Blackburn's testimony. The trial judge, outside the presence of the jury, stated to counsel the following: "I believe the answer

to that is no. We don't operate in realtime. We do not have that available. I propose telling them no, and reminding them it's their duty to remember the evidence, recalling and remembering the evidence." Neither the State nor counsel for defendant objected to the trial judge's opinion on the matter. After bringing in the jury, the trial judge answered the jury's question this way: "The answer is no, we do not operate in realtime and don't have that available for you. It is your collective duty to recall and remember the evidence." Neither party objected to the aforesaid statement to the jury.

"If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence." N.C. Gen. Stat. § 15A-1233(a) (2019). It is well settled that "where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) (citations omitted); *State v. Perez*, 135 N.C. App. 543, 554, 522 S.E.2d 102, 110 (1999) (citations omitted) ("A trial court's ruling in response to a request by the jury to review testimony or other evidence is a discretionary decision, ordinarily reviewable only for an abuse thereof.").

¶ 29        In the context of jury requests, the trial court errs when it refuses to exercise its discretion in the erroneous belief that it has no discretion to grant the jurors' request. *See Perez*, 135 N.C. App. at 554, 522 S.E.2d at 110; *see also State v. Barrow*, 350 N.C. 640, 646, 517 S.E.2d 374, 378 (1999). "Thus, in summary, we must consider if the trial court failed to exercise its discretion. If the trial court did indeed fail to exercise its discretion, this would constitute error, and we must then consider whether this error was prejudicial." *State v. Long*, 196 N.C. App. 22, 28, 674 S.E.2d 696, 700 (2009) (citations omitted). Such error is only prejudicial if defendant can show that (1) the requested testimony involved issues of some confusion and contradiction, and (2) it is likely that a jury would want to review such testimony. *State v. Johnson*, 164 N.C. App. 1, 20, 595 S.E.2d 176, 187 (2004) (citation and quotation marks omitted).

¶ 30        Here, the trial judge did not impermissibly deny the jurors' request based solely on the unavailability of the transcript. The trial judge's statement to the jury reflects that the trial court considered, but in its discretion, denied the jury's request in compliance with N.C. Gen. Stat. § 15A-1233(a). *See State v. Guevara*, 349 N.C. 243, 253, 506 S.E.2d 711, 718 (1998) (holding that because the "trial court did not say or indicate that it could not make the transcript or review of the testimony available to the jury[,]" defendant failed to show that the trial court failed to exercise its discretion). In short, the trial court exercised its discretion in denying the jury's

request for a copy of Blackburn's trial testimony. *See State v. Lawrence*, 352 N.C. 1, 28, 530 S.E.2d 807, 824 (2000). Defendant acquiesced to the court's instruction and cannot now complain that he was prejudiced by the trial judge's decision on the matter.

## III.    Conclusion

For the foregoing reasons, we vacate the conspiracy conviction in Case No. 17 CRS 50616. In addition, we hold that the trial court did not err, much less commit prejudicial error, by denying the jury's request to review a copy of Daniel Blackburn's trial testimony.

VACATED IN PART; NO ERROR IN PART.

Judge INMAN concurs.

Judge TYSON concurs in part and dissents in part by separate opinion.

TYSON, Judge, concurring in part, dissenting in part.

¶ 32     Defendant has failed to carry his burden on appeal to prove any error occurred or, even if so, has failed to show he suffered any prejudice. I concur with the majority opinion's conclusion that no prejudicial or plain error occurred in defendant's convictions for robbery with a dangerous weapon, felonious breaking and entering, and conspiracy to commit felonious breaking and entering, and defendant is not entitled to a new sentencing hearing. I also concur with the majority's opinion concluding the trial court did not err by denying the jury's request to review a transcript copy of Daniel Blackburn's trial testimony.

¶ 33     There is sufficient evidence to deny defendant's motion to dismiss and to submit the charge of conspiracy to commit robbery with a dangerous weapon to the jury. There is no error or prejudice in defendant's conviction for conspiracy to commit robbery with a dangerous weapon. I concur in part and respectfully dissent in part.

## I.     Standard of Review

¶ 34     "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "'Upon [d]efendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of [d]efendant's being the perpetrator of such offense. If so,

the motion is properly denied.'" *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "[T]he evidence need only give rise to a reasonable inference of guilt" to survive defendant's motion to dismiss and for the charge to be properly submitted to the jury for determination. *State v. Turnage*, 362 N.C. 491, 494, 666 S.E.2d 753, 755 (2008) (internal quotations omitted) (citing *State v. Stone,* 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988)).

## II.    Analysis

¶ 35        "A criminal conspiracy is an agreement between two or more persons to do an unlawful act . . . ." *State v. Massey*, 76 N.C. App. 660, 661, 334 S.E.2d 71, 72 (1985). "A conspiracy may be shown by express agreement or an implied understanding." *State v. Choppy*, 141 N.C. App. 32, 39, 539 S.E.2d 44, 49 (2000).

¶ 36        Our Supreme Court stated nearly ninety years ago: "Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933).

¶ 37        Defendant argues the court should have instructed the jury on just one conspiracy, robbery. Defendant argues, and the majority's opinion erroneously

agrees, he and his co-conspirators only discussed the robbery, and the breaking and entering was a consequence of the intended robbery. Defendant argues because the conspiracy to break and enter was antecedent to the robbery, the conspiracy to break and enter should be vacated, and the case should be remanded for re-sentencing.

¶ 38        The State argues sufficient evidence tends to show two separate conspiracies. The agreement to break and enter was not part of defendant's original plan and agreement to commit robbery. Defendant had to change how, when, and where the robbery would be committed once Beshears refused to meet Baker or Silva in the parking lot. Defendant then conspired with Holloway to break and enter Beshears' apartment. While enroute to Boone, defendant sent a text message to his co-conspirator Baker, stating that "Ima [sic] take all the money [Beshears] got too I might can have her take me to [Trivette's] money." Baker initially had set up the drug transaction between Beshears and Silva to occur in the parking lot.

¶ 39        The separate conspiracy indictment and conviction is appropriate since it was agreed to at a separate time and by separate co-conspirators. The State also argues the conspiracy charge was consolidated into the underlying felony, and, if this Court were to vacate the conspiracy charge, remanding for resentencing is unnecessary. We all agree the sentence imposed upon remand would not change.

¶ 40        The State's evidence tended to show, and the jury could reasonably conclude, there was enough circumstantial evidence to show separate conspiracies to commit

armed robbery and to break and enter. After Silva went inside of Beshears' apartment, it is logical defendant and Holloway reached an agreement to break into the apartment to get the money and drugs. Based upon the evidence and the actions of the parties, a separate conspiratorial agreement between defendant and Holloway was reached in order to break and enter into the apartment.

The State's evidence meets all of our Supreme Court's enumerated factors to consider in deciding whether multiple agreements constitute a single conspiracy or multiple conspiracies. These factors include, "[t]he nature of the agreement or agreements, the objectives of the conspiracies, the time interval between them, the number of participants, and the number of meetings are all factors that may be considered." *State v. Tirado*, 358 N.C. 551, 577, 599 S.E.2d 515, 533 (2004) (citation omitted). Defendant's argument is without merit.

### III. Conclusion

The State presented sufficient circumstantial evidence to allow the jury to conclude there were two separate conspiracies to break and enter and to commit armed robbery. Defendant and the other co-defendant, Holloway, did not initially have to break and enter the apartment to rob Beshears or Trivette.

Viewed in the light most favorable to the State, the evidence and the actions of the parties clearly show separate and distinct agreements at different times between defendant, Baker, Silva, and Holloway to commit armed robbery. Also viewed in the

light most favorable to the State, defendant later agreed to a separate conspiracy with Holloway to break and enter Beshears' apartment.

There are no errors in any of defendant's convictions, including his conspiracy to commit armed robbery in Case No. 17 CRS 50616. I concur in part and respectfully dissent in part.